550 So.2d 882 (1989)
George Benton MERRITT, Sr., et al., Appellee,
v.
Dianne Cox MERRITT, et al., Appellant.
No. 20851-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1989.
*883 Fish, Montgomery & Robinson by John M. Robinson, Springhill, and Susan D. Scott, Appeal Atty., Shreveport, for appellant.
Kitchens, Benton, Kitchens, Bolin & Warren by Paul E. Kitchens, Minden, for appellee.
Before MARVIN, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
Shortly after a judgment of separation which continued sole custody of four boys with their mother, the paternal grandparents filed a new suit against the mother and father seeking temporary custody of their grandsons, or alternatively, grandparent visitation. The father, at the hearing on the rule, consented to his parents having custody. The mother, appellant herein, opposed the grandparents' demands. After hearing the evidence, the trial court orally ruled in favor of a "temporary joint custody arrangement" between the mother and the paternal grandparents, with the latter designated as domiciliary custodians. The signed judgment, however, did not refer to the custody arrangement as "temporary."
The mother appeals, urging that the trial court erred in (1) awarding joint custody to a parent and nonparent; (2) removing custody from the mother without specifically finding that an award of custody to her was detrimental to the children; (3) depriving the mother of custody upon insufficient evidence of detriment to the children warranting an award of custody to a nonparent; (4) affording insufficient weight to *884 evidence of the father's abusive conduct toward the mother; and (5) using an award of custody to regulate human behavior and to punish the mother for minor wrongdoing. After carefully considering the evidence and the applicable legal principles, we find merit in appellant's contention that the evidence does not establish that custody with her will result in grave detriment to the children, necessitating an award of custody to a nonparent. Accordingly, for the reasons assigned, we reverse the judgment of the trial court and reinstate the prior custody award set forth in the separation judgment.

Facts
In July of 1988, Dianne Cox Merritt and her husband, George Benton Merritt, Jr., physically separated after several years of marital discord aggravated by economic problems. Dianne filed a separation suit against George, Jr., requesting, among other relief, provisional and permanent custody of the four boys born during their 17-year marriage: Jason, 15 years old; Joseph, 12; Joshua, 10; and Jacob, eight. Although George was devastated and bitter over the break-up of his marriage, and although he and Dianne had frequent heated confrontations as a result of their separation, he chose not to contest the legal proceedings. Dianne received the provisional custody of the children; later, on October 14, 1988, a judgment of separation by default continued her in the permanent custody of the children.
On October 18, 1988 (just four days later), the paternal grandparents, George Merritt, Sr. and Sue Merritt, filed the instant suit against Dianne and George, Jr. seeking temporary custody of the four boys or, alternatively, grandparent visitation privileges. Since the two older boys were physically staying with them at the time, the grandparents obtained an ex parte order granting them visitation privileges pending a hearing on the rule for custody. The grandparents' petition alleged that the separation had caused a great deal of emotional trauma to Dianne and George, Jr. as well as the children; that Dianne had abused the children, used profane language around them, told them on occasions she hated them; and that she lacked the financial means to provide for their support. Therefore, the grandparents contended that they should be awarded the temporary custody of the children during this period of unrest and uncertainty.
Though initially distressed that his parents had filed a petition for custody, George, Jr. soon agreed that it was best for them to have temporary custody until he and his wife got their problems settled. George, Jr. ultimately supported his parents' efforts at trial.
Dianne and George, Jr. last lived together with the children in Cotton Valley, Louisiana. The minor boys attended the Cotton Valley School. Financial difficulties had forced the parents to declare bankruptcy and give up their former family home. Sometime after the separation, Dianne moved to Homer, Louisiana, 25 miles east of Cotton Valley, where she is renting a nice five bedroom, three bath home that is close to a park, schools, churches and a swimming pool. Her two younger boys were living with her at the time of the hearing. The two older boys were "visiting" their grandparents pursuant to the court order. All four boys were enrolled in the Cotton Valley School.
George, Jr., at the time of the hearing, lived in a mobile home in Sarepta, Louisiana, some six to eight miles from Cotton Valley where he worked shift work.
Both grandparents testified at the hearing. They have been married 37 years, work together checking oil well production approximately four hours per day, have plenty of time to look after the children and are stable and financially secure. They live in Haynesville, Louisiana, 23 miles from Cotton Valley, in a three bedroom house with one bath on 255 acres of land. They love their grandsons. Both testified the four boys had been unhappy since their parents physically separated. Although Sue Merritt had not observed Dianne caring for her children since the physical separation, she also testified that *885 Dianne had abused them by hitting them, snatching and scratching them and cursing at and around them. Sue Merritt also testified that Dianne had been highly emotional since the separation. The grandparents stated that George, Jr. had been greatly upset over the separation. Both said that Dianne suffered from diabetes which they obviously felt affected her ability to care for her children. George, Sr. testified that Dianne had cursed him on occasion since the separation when he tried to get things straightened out. Both grandparents quickly admitted that their whole family was involved in their son and daughter-in-law's marital dispute. They acknowledged that both Dianne and George, Jr. love their children. The grandparents emphasized repeatedly that their purpose in seeking custody was to get the boys out of the marital discord and place them temporarily in a "neutral zone" until Dianne got "straightened out."
George, Jr. testified on behalf of his parents stating that he consented to their having temporary custody because he did not have the physical facilities, and his work schedule would not permit him, to have custody of his sons. He emphasized he was against the separation; that it was the worst thing that had ever happened to him and that he had every intention of reconciling the marriage. He felt that the separation had the children worried and upset. He testified that Dianne was not an unfit mother but then proceeded to relate that Dianne was a diabetic, had been emotionally stressed over the separation, and had, he felt, in the past physically abused or over-disciplined the children. George, Jr. admitted several confrontations between himself and Dianne since the separation and in the children's presence; during these, he claims, Dianne had cursed him and told him she did not love him. Although he stated he had not seen Dianne get too physical with the children since the separation, he had, during the marriage, on occasion, seen Dianne slap the children in the face; hit them on top of their heads with her fist; spank them (to which he did not object); raise her voice and shout at them; call them little bastards; and on one occasion tell them she hated them and they made her so mad sometimes that she could kill them. He accused Dianne of being on Joseph constantly but stated he never saw her mistreat Jacob. He complained that, on occasion, Dianne made him and the children clean the house before she would allow them to go hunting, fishing or to play ball. He expressed concern over who would take care of the children if Dianne decided to return to college to complete her degree in either nursing or education. When asked how he felt about allowing his parents to have custody, George, Jr. replied that he felt it was best because of the separation proceedings and because it would give him and Dianne the opportunity to straighten out their problems; he also felt the children were being used as leverage on both sides and needed to be temporarily in a "neutral corner." He admitted that he would have no difficulty seeing and spending time with his children if his parents had custody.
Mrs. Faye Newsom, the boys' school principal, testified that she knew the Merritt children well, that they were presently enrolled in the Cotton Valley School and were all outstanding students. She was aware of their parents' separation; she felt the boys had shown some feeling of lack of security but no "far out" behavior as a result of the separation. She felt all four of the boys had adjusted to the situation fairly well and could handle the problem. Mrs. Newsom related that Dianne had initially enrolled the two older boys in the Cotton Valley School and the two younger boys in school in Homer at the beginning of the year. Realizing that the younger boys needed more security during the time of the marital discord, Dianne had sought Mrs. Newsom's advice and then returned them to Cotton Valley. Mrs. Newsom stated she never observed anything to make her believe or suspect the children had been abused. She felt the parents, as well as the grandparents, were good people who loved the children. She believed the children loved both their parents and grandparents. Mrs. Newsom testified that Dianne had always been willing to participate *886 and help in the children's school activities. She characterized Dianne's relationship with her boys as revealing a closeness that occurs only between children and their mother. Mrs. Newsom stated that she believed the two oldest boys would adjust quickly if told to live with their mother; the crucial thing, she stated, was to keep the four boys together. In fact, Mrs. Newsom stated that George, Sr. had told her many times that he had no desire to take the children from George, Jr. and Dianne, and that what he wanted was for them to raise the children and bring them to visit him.
The trial court interviewed the four boys outside of the parties' presence and without questioning by the attorneys.
Jason, the oldest, who was classified by Mrs. Newsom as very mature for his age and an outstanding student in his class, testified that he had been pretty upset because his parents separated and preferred to temporarily live with his grandparents because they presently had a more stable home. Jason stated he loved his mother and father very much and would not want to be separated from them for any period of time. Although he could cite a few instances of pinching and grabbing that he felt constituted mild over-discipline, he admitted that Dianne was a good mother who never really abused the children and had recently been under a great deal of pressure. He knew Dianne loved him and his brothers. He recalled a few instances when his parents and grandfather were very angry and used profane language. He stated that his mother had said she hated the children on occasion when things got really rough. Jason testified he had a great home with his parents and hoped that they would get back together. He felt that if the children could be away for a while, his mother and father could concentrate on how to stabilize their home. In fact, he frankly stated, "That was one of the bases of this whole thing ... we're all in hopes that they would get back together." If custody were left with his mother, Jason testified he would make the best of it and work to make everything as happy as possible.
Joseph, 12 years old, stated right away that he wanted to stay with his grandparents temporarily. His purpose in so doing was to get out of his parents' way so they could reconcile. If they did, he wanted to go back and live with them. If not, he testified he wanted to live with his father. Joseph related that his mother had used bad language around him, she had gotten mad when he fought with Joshua and had hit him pretty hard; she even told him in a moment of great stress that she hated him, but he did not believe that. Joseph specifically related an incident when his mother hit him on the right leg pretty hard after she tried to stop him and Jacob from fighting. He then testified that he had earlier hurt the leg playing kick-ball.
Joshua, 10 years old, stated he lived with his mother but would rather live with his grandparents because he wants to be with his older brothers and when his father comes to his mother's home a big fight results. However, if all his brothers could be in the same place he stated it made no difference to him where they lived.
Jacob, who is eight years old and lives with his mother, stated he likes living with his mother and wants to continue living with her but also wants to live with his brothers.
The grandparents also introduced testimony from Syralja Merritt, another daughter-in-law, to the effect that Dianne had experienced some problems with the boys since the separation, had contemplated suicide and had suffered an insulin attack with a resultant brief loss of memory. She also testified that Dianne had said if she got custody of the children they would be enrolled in school in Homer by the next year. This witness was, however, very complimentary of the four boys, stating that they were very well behaved and presented no problem to keep.
Dianne Merritt testified that she loved her children and had raised them; that they were good students and well mannered. She admitted disciplining the boys when they needed it but denied physically abusing them. She did not recall ever telling *887 her children she hated them. One time she accidentally scratched Joseph's face when she grabbed his cheeks to make him look at her and he jerked away. She corroborated Joseph's statement that he had first hurt his leg playing kick-ball on Saturday, but admitted that a day or so later she forgot about his injury and hit him on that leg while disciplining him for fighting. Dianne stated she moved to Homer because her mother and stepfather live there and because she no longer felt secure in Cotton Valley. She testified she did hope that her sons would get adjusted in Homer and would be amenable to attending school there by the next school year. She further acknowledged that she hoped to return to Southern Arkansas University or Louisiana Tech to complete her degree in either nursing or education. She conceded that during a sad moment while visiting the former family home that had been lost due to bankruptcy, she made the statement that she would be better off dead. Dianne felt she could support her children on the $500 per month child support plus her small earnings from substitute teaching, apartment cleaning and baby sitting. She also receives financial help from her mother and sister. Though deeply hurt by these proceedings, Dianne stated she realized the need of George, Jr.'s help in raising the children and would readily consent to letting the boys visit the paternal grandparents.
Other witnesses also testified. Douglas Lewis, a neighbor and friend of the grandparents', testified that Mr. and Mrs. Merritt, Sr. had a suitable home and a good relationship with the children. Dianne's mother, sister, brother, uncle and former neighbor all testified that Dianne was a good mother and fully capable of raising her children. None of these latter witnesses were aware of any fact that would make them feel that Dianne had abused her children.

Action of the trial court
After hearing all the evidence, the trial court rendered lengthy oral reasons for judgment. The court admitted the case was difficult. It acknowledged that before awarding the grandparents custody in preference to the mother, there must be some finding of "detriment." It stated that this term had been expanded by the jurisprudence, and that "before awarding custody to grandparents, * * * there must be some finding that the [parents] have been at fault or whatever." R.p. 259 (emphasis added). The trial court went on to state:
[O]ver the course of two days the Court has heard a multitude of issues and has had to consider a number of things. I want to point out that it has been most persuasive to the Court, the conversations, and I won't call it testimony, the conversations that we had or I had with the four boys that are involved in this case. They are very intelligent boys. Their parents should be proud of them. I know the parents love them very much and their demeanor before the Court was excellent, was intelligent, and was, bottom line, persuasive to the Court. For that reason this Court will name as the primary custodian of these children the grandparents[.] R.p. 259.
The trial court then established a joint custody arrangement with the grandparents being the domiciliary or primary custodians during the school months and the mother having custody from Fridays at 3:00 p.m. until Sunday at 8:00 p.m. During the months of June, July and August, the mother was granted custody during the week with the grandparents having custody on the weekend; and the grandparents received custody during two consecutive weeks in August for purposes of a vacation. Holidays were rotated.
The trial court commented:
Mrs. Dianne Merritt has indicated, and this is a very laudable thing for her to do, she wishes to pursue her studies and get her degree and I encourage her to do that. I think that is good. That has had some bearing on what the Court has to decide today, because I want to be sure that you get your education and this, of course, is a temporary custody award, you understand that. And you should be encouraged to pursue your education and get that and if you had the *888 children during the week, that's a factor that bears on the Court's consideration, that you would not be able to devote the time to your studies that I think you should devote and yet tend to four boys. R.p.p. 260, 261 (emphasis added).
The trial court never concluded in its oral reasons that Dianne Merritt was an unfit mother or abused her children in any way, physically, mentally or verbally. The trial court did comment that the children were bright and intelligent. The court urged cooperation and communication between the parties and emphasized time and again that it was issuing a temporary custody order. Concluding its oral reasons, the trial court further stated:
[T]he Court's primary consideration has got to be what is in the best interest of the children. And that has been the Court's approach in this matter. R.p. 264.
The formal judgment was signed October 28, 1988. It states that the court considered that "to continue custody of the minor children with either of the parents would be detrimental to the children and that the award to the non-parent [is] required to serve the children's best interests[.]" We note with interest that the joint custody award contained in the judgment, with the grandparents designated as domiciliary and primary custodians, is not a temporary custody decree.

Discussion
LSA-C.C. art. 157 provides that in all cases of separation and divorce, and change of custody after an original award, permanent custody of the child or children shall be granted in accordance with civil code article 146, which provides in part:
B. Before the court makes any order awarding custody to a person or persons other than a parent without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interest of the child. Allegations that parental custody would be detrimental to the child, other than a statement of that ultimate fact, shall not appear in the pleadings.
Although the trial court's judgment ostensibly awards joint custody to the mother and the grandparents, the effect of the scheme is a de facto termination of parental custody. A plan such as the instant one may well be acceptable as a joint custody arrangement between two parents since it would tend to maintain the integrity of parental duties and responsibilities. However, in a contest between natural parents and nonparents, we have no trouble concluding that such a plan as this effectively deprives the natural parent of the primary duty and responsibility of raising her children and amounts to a deprivation of her custody in favor of nonparents. We therefore discuss the issue as though custody had been taken from the parent and awarded to the nonparents. In light of this conclusion, we also pretermit the interesting issue of whether joint custody between a parent and nonparent is ever legally possible under LSA-C.C. art. 146.
Prior to the amendment of article 146 by Act 307 of 1982, the jurisprudential rules regarding custody disputes between parents and nonparents required an express finding that the parent was either unable or unfit to provide a home for the child or a finding that the parent had forfeited his or her paramount parental rights before custody could be taken from the parent. Wood v. Beard, 290 So.2d 675 (La.1974).
It is now settled that article 146B expands the rule of Wood v. Beard, supra, by allowing courts more latitude or freedom to pursue the primary goal of assuring that the best interest of the child is served in resolving custody disputes between parent and nonparent litigants while still safeguarding the paramount rights of parents to the custody of their children. Recknagel v. Roberts, 465 So.2d 844 (La.App. 2d Cir.1985), writ denied 468 So.2d 579 (La. 1985); Boyett v. Boyett, 448 So.2d 819 (La. App. 2d Cir.1984); Hughes v. McKenzie, 539 So.2d 965 (La.App. 2d Cir.1989), writ denied 542 So.2d 1388 (La.1989).
Article 146B sets forth a two-tiered standard which must be met before a natural parent may be denied custody of his or her child in favor of a nonparent: the *889 trial court must determine that an award of custody to the parent would be detrimental to the child and that the award to a nonparent is required to serve the best interest of the child. Boyett v. Boyett, supra; Hughes v. McKenzie, supra; Lions v. Lions, 488 So.2d 445 (La.App. 3d Cir.1986). The statutory term "detrimental to the child" somewhat broadens the former jurisprudential rule to include, in addition to parental unfitness, inability to provide a home, and abandonment of parental rights, other circumstances that would cause the child to suffer positive and substantial harm. Boyett v. Boyett, supra; Hughes v. McKenzie, supra; M. Moreau and C. Ho, "Child Custody Awards to Non-Parents Under Article 146(B)," 33 Loy.L.Rev. 51, 59 (1987). Under 146B, as amended, a parent still enjoys a paramount right to custody of his child. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This right, however, can be outweighed by compelling reasons that directly relate to parental custody and result or would result in substantial harm to the child, thus making nonparental custody essential. Boyett v. Boyett, supra. When parental custody causes substantial harm to a child, custody can then be awarded to a nonparent in accordance with the best interest standard.
The burden of proving that the parent's custody would be detrimental or result in substantial harm to the child lies with the nonparent. Gras v. Gras, 489 So.2d 1283 (La.App. 2d Cir.1986), writ denied 493 So.2d 1222 (La.1986). The substantial harm must be expressly determined and supported by convincing proof. Santosky v. Kramer, supra; State in Int. of Jones v. Jones, 430 So.2d 169 (La.App. 2d Cir.1983).
In child custody cases, the decision of the trial court is to be given great weight and overturned only where there is clear abuse of discretion. Bordelon v. Bordelon, 390 So.2d 1325 (La.1980); Everett v. Everett, 433 So.2d 705 (La.1983); Thompson v. Thompson, 532 So.2d 101 (La.1988).
We have focused our attention on whether the evidence in this record convincingly shows that Dianne Merritt's custody of her four minor sons is sufficiently detrimental or substantially harmful to their well-being as to warrant a change in primary custody to the grandparents.
We concede that the formal judgment recites that the court considered that continued custody of the children with either parent would be detrimental to the children. However, an analysis of the extensive oral reasons for judgment gives little clue as to what compelling circumstances the trial court found that resulted in substantial harm to the children.
It cannot be seriously contended that this record offers convincing proof that Dianne Merritt physically or mentally abused her children. Mrs. Sue Merritt, George, Jr., and several of the children testified in generalities that Dianne had occasionally over-disciplined her children. However, this testimony related few specific instances of "abuse." Prior to the legal separation, no one ever registered complaints of child abuse, not even the grandparents. George, Jr. admitted that Dianne is a good mother; the children's statements do not describe genuine abuse. Moreover, in its oral reasons the trial court was apparently unable to find that Dianne abused her children. Plainly, had the court felt Dianne was a child abuser it would not have awarded her physical custody of her boys for two days each school week, 2½ months during the summer and alternate holidays. In sum, the evidence in this record does not suffice to carry the grandparents' burden of convincing proof that Dianne physically abused her children.
There was some evidence, including a frank admission by Dianne, that she occasionally used profanity in front of the children. However, most of these instances occurred during confrontations with George, Jr. after the physical separation. George, Jr. admitted he provoked most of these confrontations. He did not deny taking Dianne's van keys from her and tossing them into the lake, or destroying her piano; he also admitted that the confrontation at Homer could well have been his fault. Even the children, when relating such instances, recognized that they occurred during *890 times of extreme stress. This conduct, while not to be applauded (as aptly noted by the trial court), was not shown to be habitual and does not rise to the level of detriment necessary to deprive this parent of custody of her children.
As for the allegation that Dianne may have on one occasion told one of the boys that she hated them, and told one or more of them they made her so mad she could kill them, everyone who recalled readily understood she did not mean it. This conduct is not sufficiently detrimental to the children to deprive Dianne of their custody. Again, we note that the trial court did not consider such conduct so detrimental as to deprive Dianne of the limited custodial time it awarded to her.
In its reasons for judgment, the trial court did not even mention Dianne's diabetes, her alleged hot temper, or the allegations by George, Jr. that she had cried more since the separation than previously during the marriage. The trial court obviously did not conclude, and the record does not support a conclusion, that this conduct was substantially harmful to the children or supplied the degree of harm necessary to deprive Dianne of custody.
George, Jr. testified Dianne was a good mother. So did Jason, Dianne's mother, brother, sister, uncle and neighbor. The children love their mother. The trial court found as a fact that Dianne loved her children. Mrs. Newsom felt Dianne was a good mother. She also felt the children would adjust favorably to the situation in their mother's custody. The grandparents testified that they were attempting to gain temporary custody only in order to give Dianne and George, Jr. an opportunity to reconcile or work out their marital problems. The testimony of George, Jr., the grandparents and the children reveals that their chief complaint was the parents' separation; these witnesses certainly were aware that Dianne was the one who was resisting reconciliation. The grandparents concede that if George, Jr. and Dianne were to reconcile, the children should live with them. Everyone involved described the children as outstanding young men who were good students, well behaved and well mannered. This evidence, even more convincingly, undermines the trial court's "finding" of detriment. On the contrary, the evidence does not describe abused children.
It becomes apparent from a wealth of testimony that the primary goal of this lawsuit was to get the children into a "neutral zone" and out of the way so Dianne and George, Jr. could work out their problems and hopefully reconcile. While this may well be an admirable aim, an award of custody is not a tool to regulate human behavior. Everett v. Everett, supra. The break-up of a marriage and the temporary consequences of insecurity and instability of the home do not normally give rise to the substantial harm necessary to deprive a parent of the custody of his or her children. Although admittedly hard to deal with, these problems are usually temporary and not sufficiently detrimental to deprive a parent of custody. See Boykin v. Corless, 488 So.2d 1153 (La.App. 2d Cir.1986); In re Custody of Reed, 497 So.2d 1084 (La.App. 4th Cir.1986). George, Jr., the grandparents, the children and even the trial court in its reasons for judgment all affirmatively stated any degree of detriment resulting from Dianne's custody was only of a temporary nature.
The trial court expressly stated that it awarded primary custody to the grandparents because of the children's testimony and the evidence that Dianne hoped to return to college and secure her degree. The children's testimony does not prove that Dianne's continued custody would cause them substantial harm. Admittedly, three of the children expressed a qualified preference to live with the grandparents temporarily in order to allow their parents an opportunity to work out their marital problems. It is not surprising that during this time of insecurity the three oldest boys would be willing to live with the grandparents temporarily. The land around the grandparents' home is suitable for hunting and fishing, which all three boys enjoy; the grandparents also offer a stable environment and can provide the children with greater financial support.
The desires of a child may be a factor to consider, along with all other circumstances of a custody case, but the *891 child's preference is not determinative of custody. State, ex rel. Paul v. Peniston, 235 La. 579, 105 So.2d 228 (1958); Berry v. Berry, 307 So.2d 821 (La.App. 3d Cir.1975); Schramm v. Simpson, 343 So.2d 423 (La. App. 3d Cir.1977); Morgan v. Huddlestone, 430 So.2d 304 (La.App. 3d Cir.1983). We would note that a mother's role in rearing her children differs from the grandparents'. The mother has a duty and responsibility to teach and discipline the children and this often requires actions that are unpleasant for the children.
Admittedly, should Dianne return to school, both she and the children will be temporarily inconvenienced because of the additional demands on her time. However, the demands on a mother who is securing an education or working should not generally create an atmosphere of such detriment or substantial harm so as to deprive her of the custody of her children. Furthermore, the trial court praised Dianne's ambition to get her college degree and encouraged her to succeed; however, to assure her success, it effectively took away custody of the children. The court stated that Dianne's studies would cause her to devote less time to the children, but made absolutely no finding of detriment; rather, the approach seems once again to have been to consider the best interest test only. This is not sufficient to justify the change of custody.
The facts adduced by the grandparents, taken individually or collectively, do not compare with the detrimental misconduct this court has found in other cases.[1] The trial court apparently misconstrued the degree of detriment required to deprive a parent of custody of her children. It is only when the extent of detriment faced by the children rises to the level of "substantial harm" will the court find that it outweighs the parent's superior right of custody. In this case, the trial court could not have found that an award of custody to the mother would substantially harm the children's well-being.
In sum, we hold that the trial court abused its great discretion by changing the custody of the four minor sons from the mother, Dianne Merritt, to joint custody between the mother and the paternal grandparents with the latter designated as the primary custodian. The evidence does not convincingly prove that sole custody with the mother is or would be sufficiently detrimental or substantially harmful to the children to justify an award of primary custody to a nonparent. The judgment of the trial court is reversed and judgment is rendered reinstating custody with Dianne Merritt in accordance with the terms set forth in the separation decree between her and George Benton Merritt, Jr. Costs are assessed to the appellees, Mr. and Mrs. George Merritt, Sr.
REVERSED AND RENDERED.
NOTES
[1] In previous cases, we have awarded custody to a nonparent when the parent has had a history of drug abuse, Gras v. Gras, supra; Bolding v. Bolding, 532 So.2d 1199 (La.App. 2d Cir.1988); Thomas v. Thomas, 519 So.2d 357 (La.App. 2d Cir.1988); when the parent had participated or engaged in adultery or prostitution to the knowledge of the child, Bolding, supra; Gras v. Gras, supra; Hughes v. McKenzie, supra; and when the nonparent has had physical custody and care of the child long enough for a psychological parenting bond to form. Boyett v. Boyett, supra; Hughes v. McKenzie, supra.