GUIDRY, Judge.
James and Betty Blaine appeal a judgment of the trial court awarding custody of their infant son, David Blaine, to his maternal grandparents, Vohrance and Odelise Granger. We affirm.
James and Betty Blaine were married in 1981. They are the parents of two children, Misty Blaine, born in 1988, and David Blaine, born June 12, 1991. Although listed on the birth certificates of each child as the biological father, James is, in fact, incapable of producing a child and both children were fathered by a family friend at their request. Misty is a healthy, normal child, whereas David was born with serious birth defects. David has a very small right eye and nose, a right hand which he cannot open and he was born missing the central part of his brain, the corpus callosum. Because of the latter defect and perhaps other central nervous system problems, David is prone to seizures and at birth could not suck. The seizure problem necessitated the infant being placed on phenobarbital twice a day for life and around the clock use of a respiratory and heart rate monitor. The record reflects that oxygen and suction equipment must always be kept close at hand. Because of his inability to suck, a tube had to be implanted in the child’s abdomen in order to provide nourishment. Dr. Chih Hao Lin, David’s pediatrician, testified that David’s life span, which he estimates at two years, depends upon the quality of care he receives. Dr. Lin also stated that children with David’s defects usually die of complications such as pneumonia or of suffocation due to a seizure.
James left Betty when Betty was approximately six months pregnant with David. Betty and Misty then moved into her parents’ home. When David was finally discharged from the hospital, over a month *861 after he was born, he too was taken to the Granger home. On Friday, August 30, 1991, Betty packed some clothes and left the Granger home without taking her children or telling her parents where she was going, how long she would be gone or how she could be contacted. Betty called on Saturday to check on David but still did not say where she was. Then on Tuesday, September 3, 1991, Betty called to inform her parents that she and James had reconciled, found an apartment and that she was coming to get the children.
The Grangers, fearing that David would not get proper home medical care, refused to let David be taken by his parents. After several unsuccessful attempts by James and Betty to get David, they filed a petition for a writ of habeas corpus on October 31, 1991. The Grangers answered the petition alleging that the return of David to his parents would be detrimental to the child and that it would be in David’s best interest to be placed in their custody. A hearing on the writ was held November 12, 1991, and, on March 4, 1992, judgment was rendered granting custody of David to the Grangers. This appeal followed.
On appeal the Blaines argue two assignments of error: (1) the trial court erred in holding a hearing on the question of the best interest of the child as a result of plaintiffs’ petition for a writ of habeas corpus; and, (2) the trial court erred in awarding custody of David to the Grangers. Appellants also argue, for the first time on appeal, that the Grangers have no right or cause of action for custody of David. We will consider assignment number one and the exceptions together.
Assignment No. 1 and Exceptions of No Right or Cause of Action
Plaintiffs argue that inasmuch as their marriage is extant, Vohrance and Odelise Granger, David’s grandparents, have no right of action to seek custody of their grandchild. They further argue that the Grangers’ answer to the Blaines’ petition seeking custody of David does not state a cause of action. Finally, the Blaines argue that the hearing on their petition for a writ of habeas corpus was not the proper forum in which to conduct a custody hearing.
We find no merit in appellants’ assignment of error or their exceptions based upon the Louisiana Supreme Court’s ruling in Wood v. Beard, 290 So.2d 675 (La.1974). In Wood, the mother of a child (the father was incarcerated but the marriage was extant) filed a petition for a writ of habeas corpus against her parents seeking to regain physical custody of her minor daughter. In Wood, supra, at 677, the Court stated:
Plaintiff cites the recent case of Griffith v. Roy, 263 La. 712, 269 So.2d 217 (1972), and argues from it that the district court had no “jurisdiction to deprive relatrix of the custody of her child” during the marriage. We do not agree. The district court may do more than inquire into the parentage of the child in a habeas corpus action, but should order the child “placed in the custody of a proper person.” C.C.P. 3830. To order a child placed in the custody of a parent who is not “a proper person” would be to ignore the welfare of the child. The welfare of the child, and not simply the enforcement of a parental right to the possession of the child, is of primary concern to the court. It is consequently appropriate that the district court inquire when the issue is raised, whether the parent is unfit or unable to care for the child. (Emphasis ours).
Thus, we conclude that, as in Wood, although these proceedings were initiated by the natural parents by application for a writ of habeas corpus, the trial court was vested with the jurisdiction necessary to consider the best interest of the child and order the child placed in the custody of a proper person.
Assignment No. 2
James and Betty argue that the court erred in awarding custody of David to his maternal grandparents. The law governing the award of custody of a child to a party other than his parents was recently and ably discussed by our brethren of the Fourth Circuit in the case of Schloe- *862 gel v. Schloegel, 584 So.2d 344 (La.App. 4th Cir.1991), wherein the court stated:
Louisiana recognizes that a parent has a paramount right to custody of his child. A parent may be deprived of his right to custody only for compelling reasons. Wood v. Beard, 290 So.2d 675 (La.1974). Compelling reasons for depriving a parent of this right must be supported by clear and convincing evidence. Pittman v. Jones, 559 So.2d 990 (La.App. 4th Cir.1990), writ denied, 565 So.2d 451 (La.1990).
Custody suits between parents and non-parents are governed by La.C.C. art. 131(B)1 which provides:
Before the court makes any order awarding custody to a person or persons other than a parent without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a non-parent is required to serve the best interest of the child. Allegations that parental custody would be detrimental to the child other than a statement of ultimate fact, shall not appear in the pleadings.
Thus, an award of custody to someone other than a parent can be made only if it is found that awarding custody to a parent would be detrimental to, and against the best interest of, the child. There are various ways to express the standard that “custody to a parent would be detrimental to a child.” It is not necessary that the trial court use the word “detrimental.” Batiste v. Guillory, 479 So.2d 1044 (La.App. 3rd Cir.1985). The primary consideration in custody cases is and has always been the best interest of the child. Parker v. Payton, 511 So.2d 868 (La.App. 4th 1987). The La.C.C. art. 131(B) standard allows the court to look at a multitude of factors and a totality of circumstances in making a determination. Batiste v. Guillory, supra; Bolding v. Bolding, 532 So.2d 1199 (La.App. 2nd Cir.1988). See also Parker v. Payton, supra.
See also Merritt v. Merritt, 550 So.2d 882 (La.App. 2d Cir.1989), and cases cited therein.
In this case, the trial judge did not give detailed reasons for his judgment but, rather, stated general conclusions, all of which are not fully supported in the record. In any event, our review of the record reveals no clear abuse of discretion or manifest error in the trial court’s conclusion to award custody of David to appellees.
At best, one can say that the Blaines’ lifestyle is unconventional. Neither party has held a job during their entire marriage. They live on James’ S.S.I. James claims to be totally disabled due to chronic leg ulcers and varicose veins. The Blaines also rely on food stamps, A.F.D.C. (which they receive for Misty), and the charity of friends and the Grangers. James claims to be a high school graduate and Betty graduated from West Lake High School in its special education program.
When the. Blaines were first married, their initial matrimonial domicile was an abandoned bus which they shared with two male friends. After approximately nine months, James and Betty found an apartment where they stayed for the next two years until they moved in' with another couple. In about four months, they were asked to leave and, at that point, the Gran-gers bought the Blaines a trailer. The Blaines stayed in the trailer for two years, at which time James abandoned Betty and Betty moved back in with her parents.
Upon reconciliation, the couple moved in with a lady and her son for approximately three months, then into a house for about three more months and finally into an apartment where they remained until Betty became pregnant with Misty. The apartment complex did not allow children, so Betty again moved in with her parents while James went to live with a friend. After Misty was born in 1988, the Gran-gers bought another trailer for their daughter. The first trailer had been turned into a hunting camp after it was abandoned by Betty and James. The Blames remained in this trailer for almost three years until James once again left *863 Betty, who was now six months pregnant with David. Betty and Misty moved back to the Granger home where they, and David after he was born, stayed until Betty once again reconciled with James in late August 1991. Repeating a previous pattern, James and Betty abandoned their trailer and moved into their present residence on Denise Street.
At the hearing on the writ of habeas corpus it was established that, in spite of her training at the hospital, Betty had turned off David’s monitor on at least two occasions. The in-hospital training was not only to teach Betty how to care for David’s special needs, but to impress upon her the seriousness of his condition. When questioned as to why she had turned off the monitor she explained that the noise it made kept her awake. Betty explained that because she w.as sleeping on the sofa in the same room with David and because “I wasn’t sleeping hard”, she would be able to respond if he had a seizure and thus he did not need the monitor.
While Betty and the children were living with the Grangers, Betty was the primary care giver to David. When she left and Mrs. Granger became David’s primary care giver, Mrs. Granger found the inside of David’s right hand, which he cannot open, extremely dirty. Mrs. Granger also found David’s ears so encrusted with dirt that it took her two days, using Q-tips and baby oil, to clean them. Further, Betty was not present when David was discharged from the hospital and only accompanied David on one of his four post discharge visits to the doctor. At his discharge and during the office visits, it was Mrs. Granger who received additional detailed instructions on David’s care.
As to James Blaine, he has not demonstrated either reliability or dependability as a husband and father. It was established that each month when he receives his social security disability check, he throws a “get’ together” for friends where he usually gets so drunk that he cannot control his behavior and the next day cannot remember what he did. On one occasion, clad only in a blanket, he made sexual advances on one of Betty’s friends, chasing her around the kitchen table in the trailer while Betty was taking care of Misty in another room. On another occasion, he urinated against the outside of the trailer in mid-afternoon in full view of other occupants of the trailer park, including children; and then later that same afternoon simulated sexual intercourse with his wife against the tail gate of a pickup truck parked next to the trailer. His landlord at the trailer park testified that, because of complaints over the preceding two incidents and others, if James had not abandoned his family, he would have been evicted.
Considering the totality of the circumstances and in particular that the minor child, David, requires special care which if he does not receive will have a significant detrimental effect on his life span, we find that to entrust this child, in his present condition, to parents who have a demonstrated chronically unstable marriage, who live in an unstable environment and who exhibit a lack of responsibility and inability to meet their own physical needs, would do substantial harm, i.e., be detrimental, to the child. We agree with the trial judge that it would be in David’s best interest to be placed in the Grangers’ custody until such time as the Blaines have demonstrated that they can provide a wholesome, stable and responsible environment in which to raise and care for David.
Accordingly, for the reasons stated, the judgment of the trial court is affirmed.
AFFIRMED.