665 So.2d 531 (1995)
In the Matter of Ann Marie TUCCIO Applying for Temporary Custody of Taylor G. Tuccio.
No. 95 CA 0302.
Court of Appeal of Louisiana, First Circuit.
November 16, 1995.
Rehearing Denied January 23, 1996.
*532 John Di Giulio, Baton Rouge, for Plaintiffs-Appellants Udell and Margie Dixon.
Richard E. Chaffin and Joseph M. Roussel, Baton Rouge, for Defendant-Appellee Ann Marie Tuccio.
Before CARTER and PITCHER, JJ., and CRAIN,[1] J. Pro Tem.
PITCHER, Judge.
In this proceeding, alleged paternal grandparents appeal from the judgment of the trial court denying their rule to order that the natural mother, Ann Marie Tuccio Arthur[2], and her son, Taylor Tuccio, submit to blood tests for the purpose of determining paternity. We reverse and remand.

FACTS
Jerry David Dixon (David), the deceased son of Udell and Margie Dixon, entered into a relationship with Ann Marie Tuccio Arthur (Ann) sometime in June, 1991. David and Ann began living together during the last half of 1991. Ann admitted having a sexual relationship with David from June of 1991 to November of 1992.[3] During the relationship, Ann became pregnant with Taylor Graham Tuccio (Taylor) who was born on August 20, 1992. Ann stated that she believed that she conceived Taylor on November 2, 1991. Ann testified that on November 2, 1991, she was raped by an unknown man who she believed was the father of Taylor. However, Ann admitted that she had sex with David on October 27, 1991, and November 12, 1991.
Ann told David she was pregnant in February of 1992. Ann and David continued their relationship throughout Ann's pregnancy and after the birth of Taylor. Ann testified that her relationship with David ended on November 30, 1992. Ann stated that after their relationship ended, she received lots of telephone calls from David inquiring about Taylor and her daughter, Vanessa.[4] She stated that she and David resumed a sexual relationship and then lived together during the last three weeks of March of 1993 and the first week of April of 1993. Ann stated that her reason for going back to David was to end the turmoil that David had created for her by stalking, hunting, and chasing her. Ann stated that the relationship between her and David finally ended in April, 1993. Subsequently, David was murdered on June 23, 1993.

PROCEDURAL HISTORY
On July 28, 1993, Udell and Margie Dixon (the Dixons) filed a petition for temporary *533 custody of their alleged grandson, Taylor. In the petition, the Dixons alleged that they were the paternal grandparents of Taylor. The Dixons further alleged that Ann was unable to care for Taylor because she was charged in connection with the death of their son, David. The Dixons contended that Ann had shown a total disregard for the care of Taylor.
On August 3, 1993, Ann, along with her father, Vincent Tuccio (Mr. Tuccio), filed a petition for custody in a separate action. Ann alleged that due to financial difficulties and other problems, she was currently unable to support and care for her son, Taylor. Ann contended that Taylor was presently living with her father, Mr. Tuccio, and she desired that provisional custody of Taylor be awarded to Mr. Tuccio. The trial court awarded Mr. Tuccio with provisional and temporary custody of Taylor on August 3, 1993. On August 16, 1993, the Dixons filed a motion to consolidate their petition with Mr. Tuccio's petition for custody. The trial court granted the motion to consolidate the two petitions for custody.
On October 12, 1993, the Dixons filed a rule to show cause why blood tests should not be performed. They asserted that the East Baton Rouge Coroner's Office had collected and preserved blood from David's body. The Dixons further asserted that the District Attorney's Office would not agree to release the blood for testing purposes without a court order. In the rule, the Dixons alleged that they believed that their deceased son, David, was the natural father of Taylor and requested that blood preserved from David's body, along with blood extracted from Ann and Taylor, be tested for purposes of determining David's paternity.
On March 4, 1994, a hearing on the rule to show cause for blood tests was held. After the hearing, the trial court rendered a judgment on March 9, 1994, denying the Dixons' request for an order directing Ann and Taylor to submit to blood tests. In written reasons, the trial court found that there were no statutes or cases which establish that parents of a deceased person may sue a mother to prove that they are grandparents of her child. The trial court found that "the closest the Legislature seems to have come is with LSA-R.S. 9:344B." The trial court concluded that this provision applies when the parents of a minor child live in concubinage and one dies. The parents of the deceased may obtain visitation rights. The trial court further concluded that the parents of the child must live in concubinage before proof of paternity becomes an issue. The trial court determined that the evidence did not support a finding of concubinage, as defined by the law. Therefore, the rule to show cause for blood tests must be denied.
Following the judgment, the trial court granted an order on March 25, 1994, permitting the Dixons to file a supplemental petition seeking, in the alternative, visitation rights to Taylor. The Dixons also filed a "Notice of Intent to Apply for Supervisory Writs" with the First Circuit Court of Appeal, on April 18, 1994.[5]
In Docket Number 94 CW 1229, this court denied the Dixons' application for supervisory writs, holding that the trial court's judgment is an interlocutory judgment which causes irreparable harm and is subject to appellate review. This court remanded the case and ordered that the Dixons be granted an appeal. The Dixons now appeal the trial court's judgment denying the blood test.

DISCUSSION
In this appeal, the Dixons urge the reversal of the trial court's judgment denying their request for court-ordered blood tests.
Blood tests for the determination of paternity are addressed in LSA-R.S. 9:396, et seq. LSA-R.S. 9:396A provides, in pertinent part, as follows:
A. Notwithstanding any other provision of law to the contrary, in any civil action in which paternity is a relevant fact, or in an action en desaveu, the court, upon its own initiative or upon request made by or on behalf of any person whose blood or tissue is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings *534 unduly, shall order the mother, child, and alleged father to submit to the collection of blood or tissue samples, or both, and shall direct that inherited characteristics in the samples, including but not limited to blood and tissue type, be determined by appropriate testing procedures....
The statute permits blood testing of the mother and child in cases where paternity is relevant. Moreover, the general rules of discovery may authorize blood tests where such tests are likely to produce relevant evidence. See LSA-C.C.P. art. 1422;[6]Sudwischer v. Estate of Hoffpauir, 589 So.2d 474, 475 (La. 1991), cert. denied, 504 U.S. 909, 112 S.Ct. 1937, 118 L.Ed.2d 543 (1992). Thus, the salient issue before us is whether paternity is a relevant fact in a civil action for temporary child custody or in an alternative action for visitation rights.

CUSTODY
First, we look at the issue of whether paternity is a relevant fact in a civil action for child custody. The issue of child custody is governed by LSA-C.C. art. 131.[7] Section A of this provision provides that the first preference of custody is to both parents jointly. However, section C specifies that the presumption that joint custody is in the best interest of a minor child is rebuttable, and section B sets forth a two-tiered standard which must be met before a natural parent can be denied custody of his or her child in favor of a nonparent as follows:
B. Before the court makes any order awarding custody to a person or persons other than a parent without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interest of the child.
The statutory term "detrimental to the child" somewhat broadens the former jurisprudential rule which required an express finding that the parent was either unable or unfit to provide a home for the child or a finding that the parent forfeited his or her paramount parental rights before custody could be taken from the parent. The broader standard now includes other circumstances that would cause the child to suffer positive and substantial harm. Merritt v. Merritt, 550 So.2d 882, 888-89 (La.App. 2nd Cir.1989).
Parents enjoy a paramount right of custody and may be deprived of that right only for compelling reasons, which must be expressly determined and supported by convincing evidence. McKinley v. McKinley, 25,365 p. 4-5 (La.App. 2nd Cir. 1/19/94), 631 So.2d 45, 48-49. The burden is on the nonparent seeking custody of a child to prove that custody to the parent would be detrimental to the child and the award of custody to the nonparent is in the best interest of the child. Batiste v. Guillory, 479 So.2d 1044, 1048 (La.App. 3rd Cir.1985). The best interest of the child is the sole criterion in an award or change in custody. Everett v. Everett, 433 So.2d 705, 708 (La.1983).
After considering the law and burden of proof required of a nonparent (the Dixons) in a custody proceeding, we do not find that paternity is a relevant issue for determining custody in this case. Paternity is defined as the state or condition of a father; the relationship of a father. Black's Law Dictionary (5th ed. 1979). We find that, in this particular case, the biological relationship of the father or alleged father has no bearing or relevancy to the determination of the "best interest of the child" in a custody proceeding of a nonparent who may be the child's grandparent. The possibility that the Dixons are the paternal grandparents of Taylor in no way lessens their burden of proof required under LSA-C.C. art. 131B.
*535 Our finding does not mean that the issue of paternity is never relevant in a custody proceeding. For example, in McKinley v. McKinley, 25,365 (La.App. 2nd Cir. 1/19/94), 631 So.2d 45, Paul McKinley married Wendy McKinley six weeks after she gave birth to Justin McKinley. Paul and Wendy McKinley knew that Paul was not Justin's biological father because Justin was conceived before they began dating. Nonetheless, after their marriage, Paul and Wendy executed an authentic act avowing that Paul was Justin's father. Sometime thereafter, Paul and Wendy divorced. Paul filed a petition for divorce and sought sole custody of the three children, including Justin, who was not his biological child, or in the alternative, primary custody under a joint custody plan.
The trial court ordered blood tests for the determination of Paul's paternity of Justin. The blood tests confirmed that Paul was not Justin's biological father. Therefore, the trial court concluded that it was required that Paul be considered a nonparent for purposes of the custody dispute involving Justin. After reviewing the evidence, the trial court determined that awarding custody to Wendy would be detrimental to Justin because he would be separated from his half-sisters and because Wendy's lifestyle was not conducive to rearing small children. The trial court's judgment was affirmed on appeal.
In McKinley, the determination of paternity was relevant to the issue of whether Paul was a parent or nonparent for purposes of deciding the applicable law and burden of proof required of Paul in the custody proceeding. In the case at hand, whether or not the Dixons are grandparents would not change their status as a nonparent for purposes of deciding custody. Thus, based upon the peculiar facts of this case, we find that the issue of paternity is not relevant to the proceeding for child custody.

VISITATION RIGHTS
Next, we must determine whether paternity is relevant in a proceeding for visitation rights. We note that the trial court used LSA-R.S. 9:344 in its analysis of visitation rights for grandparents. However, LSA-R.S. 9:344 did not become effective until January 1, 1994, which was after the Dixons filed suit. Thus, LSA-R.S. 9:572 is the applicable statute and will be considered in our analysis.
LSA-R.S. 9:572, entitled "Visitation rights of grandparents and siblings", provides, in pertinent part, as follows:
A. If one of the parties to a marriage dies or is interdicted, or the obligation to live together is terminated by an action of separation from bed and board, or the marriage is terminated by divorce, and there is a minor child or children of such marriage, the parents of the deceased, interdicted, separated, or divorced party without custody of such minor child or children, may have reasonable visitation rights to the child or children of the marriage during their minority, if the court in its discretion finds that such visitation rights would be in the best interest of the child or children
* * * * * *
C. When the parents of a minor child or children live in concubinage and one of the parents dies, the parents of the deceased party may have reasonable visitation rights to the child or children during their minority, if the court in its discretion finds that the grandparents have been unreasonably denied visitation rights and such visitation rights would be in the best interest of the child or children.
D. If one of the parties to a marriage dies, the obligation to live together is terminated by an action of separation from bed and board, or the marriage is terminated by divorce, the siblings of a minor child or children of the marriage may have reasonable visitation rights to such child or children during their minority if the court in its discretion finds that such visitation rights would be in the best interest of the child or children and that the siblings have been unreasonably denied visitation rights.
Under Sections A and C, grandparents are specifically given the right to seek reasonable visitation rights. However, the case before us presents a problem with the application of the statute because the Dixons' status as grandparents has not yet been established. *536 Before the Dixons can assert their right under the statute, they must prove that Taylor is their grandchild. Therefore, information sought through blood tests would produce evidence relevant to the Dixons' status. Thus, under the unique facts presented by this case, we find that paternity is a relevant fact in this proceeding for reasonable visitation rights.
Our inquiry regarding the relevance of paternity in a proceeding based upon LSA-R.S. 9:572 does not end here. In order for grandparents to enforce their right under LSA-R.S. 9:572, grandparents must establish that the parents were married, as required under section A, or that the parents lived in concubinage, as required under section C. In this case, Ann and David were not married, so section C is applicable.
LSA-R.S. 9:572C provides that when the parents of a minor child or children "live in concubinage" and one of the parents dies, the parents of the deceased party may have reasonable visitation rights to the minor child or children. Thus, the grandparents seeking visitation rights must prove that the parents lived in concubinage. The jurisprudence defines "concubinage" as a relationship of sexual content in which man and woman live together as husband and wife in a state of affairs approximating marriage. Polk v. Polk, 626 So.2d 1233, 1237 (La.App. 4th Cir. 1993), writ denied, 94-0066 (La. 2/11/94), 634 So.2d 381.
The evidence reflects that Ann and David began living together in the latter half of 1991. While they were living together, Ann became pregnant, and the relationship continued throughout the pregnancy and after the August 20, 1992, birth of Taylor. Although the record reflects that there were periods of time when Ann and David did not live together, their relationship did not come to an end until April, 1993. Subsequently, David was killed on June 23, 1993.
Ann testified that David did not support her and Taylor during her pregnancy or after Taylor's birth. Ann stated that David was unemployed. Mrs. Dixon testified that David worked at PSI and that in the latter part of her pregnancy, Ann did not work.
In written reasons, the trial court concluded that the evidence did not establish a state of concubinage as defined in law. After reviewing the record, we disagree with the trial court's conclusion. We find that the evidence supports a finding that Ann and David lived in concubinage.
Based upon our findings that paternity is a relevant fact in this proceeding for reasonable visitation rights, and that the Dixons' presented sufficient evidence of Ann and David's living in concubinage, we conclude that the Dixons are entitled to court ordered blood tests.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed, and the case is remanded to the trial court for further proceedings consistent with this judgment. Costs of this appeal are assessed to Ann Marie Tuccio.
REVERSED AND REMANDED.
NOTES
[1] Judge Hillary Crain, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] At the time of trial, Ann Marie Tuccio Arthur was in a second marriage, and her new last name was Achee. For purposes of this opinion, we will refer to her by the last name of "Arthur".
[3] Throughout her relationship with David, Ann was married to another man, Robin Arthur. Ann stated that during her relationship with David, she did not live with Robin. Ann further stated that the last time that she had seen Robin was in November of 1990.
[4] Ann and her husband, Robin Arthur, had a daughter named Vanessa. After Robin and Ann separated, Vanessa lived with Ann.
[5] The record does not contain a copy of the writ application filed by the Dixons.
[6] LSA-C.C.P. art. 1422 provides, in pertinent part:

* * * * * *
Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, ....
[7] LSA-C.C. art. 131 was amended and reenacted by Act 1993, No. 261, § 1, and became effective on January 1, 1994. The Dixons filed suit on July 28, 1993. Therefore, the former LSA-C.C. art. 131 governs the Dixons' suit.