489 So.2d 1283 (1986)
Kimberly Ballard GRAS, Appellant,
v.
Christopher Thomas GRAS, Sr., Appellee.
No. 17732-CA.
Court of Appeal of Louisiana, Second Circuit.
May 7, 1986.
Rehearing Denied June 23, 1986.
*1284 Hunter & Jack by Frances Baker Jack, Shreveport, for appellant.
Nelson, Hammons & Johnson by John L. Hammons, Shreveport, for intervenors, Sidney Gras, III and Theresa Conlan Gras.
Before HALL, JASPER E. JONES and NORRIS, JJ.
NORRIS, Judge.
This is a rule to change custody. The mother, Kim Gras, originally sued for separation in 1982 when the child, Chris Jr., was two years old. She received provisional sole custody. Two years later she sued for final divorce. Then in March 1985, the father, Chris Gras, reconvened for divorce. He also filed a reconvention with his parents requesting joint custody. In April, he filed this rule to change custody, thus setting the issue for trial in July. On the morning of trial, Mr. Gras withdrew his request for custody after he admitted that he had very recently used marijuana. Thus the issue narrowed to a contest between the mother and the paternal grandparents. After hearing all the evidence, the trial court concluded that continued custody of the mother would be detrimental to the child and that the award of custody to the grandparents was required to serve the child's best interest. He transferred custody to the grandparents with certain provisions for visitation and child support. Ms. Gras has appealed, contesting *1285 the change of custody, the child support award and the admissibility of certain medical records. For the reasons expressed, we affirm.
Mr. and Mrs. Gras were married in 1978. Chris Jr. was born in 1980. When they separated, Ms. Gras was working to earn her associate degree in nursing at Northwestern. After graduating, she took a job at the neo-natal unit at the LSU Med Center. Both the college with its studying and the job with its erratic hours necessitated keeping Chris Jr. at daycare on a regular basis. There were occasional misunderstandings about which parent was supposed to pick up Chris Jr. at closing time, and sometimes the owners of the daycare center had to stay late until one of them remembered to come. The parents accused each other of these mixups but they were of a minor nature.
The major incident concerning daycare arose in March 1985 when Ms. Gras delivered Chris Jr. at daycare. She had pierced his ear and put in a cross-shaped stud. The other children ridiculed him. There was such a reaction that the lady who ran the center tried to call Ms. Gras and inquire. When Ms. Gras could not be reached, the lady called up Mr. Gras, who promptly came and got his son. Mr. Gras is a Holsum Bakeries routeman and sales representative. He was none too pleased to find his son wearing an earring. He brought his son to the grandparents' house, where Chris Jr. usually stayed when Mr. Gras had visitation. The grandmother removed the earring but when Chris Jr. returned to daycare the following week, Ms. Gras had replaced it with another. The lady from daycare said they could not continue to host a little boy with an earring. It was after this that Mr. Gras filed his rule to change custody.
Mr. Gras and the grandparents alleged a number of emotional, physical and substance abuse problems on Ms. Gras's part. Ms. Gras admitted drinking excessively, taking an amphetamine called "crystal," and using marijuana. She also admitted suffering from a serious nervous disorder that required her to be hospitalized in New Orleans in December 1984 and January 1985. Before she left for the hospital, she brought Chris Jr. to his father and asked him to keep the boy until she got out. As a result, Mr. Gras and the intervenors cared for Chris Jr. for about six weeks. They returned Chris Jr. to Ms. Gras upon request. Ms. Gras was once again in the hospital about two weeks before trial. She had become addicted to a tranquilizer, Xanax, but suddenly stopped taking it and went into withdrawal. She spent several days at the CDU at Schumpert for treatment. The medical records from Schumpert were admitted into evidence and form the basis of Ms. Gras's first assignment of error. She was discharged from the hospital, has joined Alcoholics Anonymous and claims that all the substance abuse problems are behind her. She also insists that none of the problems ever interfered with her ability to care for Chris Jr. She argues that by voluntarily handing over the child in December 1984 she showed her ability to judge her own fitness to care for him. Now that she is free of chemicals she knows there is no impediment to her so doing.
Mr. Gras and the grandparents also alleged a long pattern of moral misconduct that he claimed had an adverse effect on Chris Jr. Shortly after the separation but before a final divorce, Ms. Gras became intimately involved with a Mr. Welch, who had been one of Mr. Gras's friends. Mr. Welch spent a lot of time at Ms. Gras's house, but no more than four nights a week, all while Chris Jr. was around. The two of them talked of marriage and went on outings together with Chris Jr. Things were going well between them until Ms. Gras found Mr. Welch was having an affair with another woman. She abruptly broke off the relationship and plunged into the depression that sent her to the hospital in New Orleans for six weeks. Shortly afterwards, she began a liaison with a Dr. Strain, a pediatrician. Dr. Strain was soon spending all his "off" time at Ms. Gras's house, about six nights a week, all while Chris Jr. was around. He placed some of his belongings there but never gave up his own apartment and on this basis denied *1286 that they were "living together." Dr. Strain was responsible for refilling and increasing her dosage of Xanax, which she originally received from a doctor in New Orleans. This is the substance she abused before she went to the CDU. At the time of trial, Ms. Gras was still seeing Mr. Strain and they were talking of marriage.
Mr. Gras and the grandparents also alleged various acts that he claimed would imperil the child's stability. During the height of her dependency, Ms. Gras quit her R.N. job. She made tentative efforts to find another job, but kept turning down offers because the hours did not suit her. She was watching her savings dwindle and was living off Mr. Gras's child support, with a little help from her friend, Dr. Strain. She admitted she would have to move out of her house soon but she had no idea where she and Chris Jr. would go. Her father offered to let them stay in his converted garage apartment.
Mr. Gras and the grandparents contended, and the trial court found, that the home environment Ms. Gras had been providing was detrimental to the child. He offered in contrast the stable home environment that his parents would be able to provide, asserting that custody with them would best serve Chris Jr.'s interest. They have a good-size house in a good neighborhood and can give Chris Jr. his own room. Caring for him would not place them in a financial strain, although they did submit an affidavit setting their expenses for taking care of Chris Jr. at $215 a month. The amount of child support is the basis of Mrs. Gras's third assignment of error. Both the grandparents work, but since Chris Jr. turned five, he will be in school during the day and not need constant supervision; they also have a 17 year old daughter who can help with babysitting if necessary. The grandparents have spent a lot of time with Chris Jr., as they have tended him most of the time when the father had visitation. They love him very much. The trial court concluded that custody in the grandparents would best serve Chris Jr.'s interest.
Ms. Gras's main argument on appeal, her second assignment of error, is that the trial court erred in removing custody from her and placing Chris Jr. with a nonparent. She correctly asserts that a parent enjoys a paramount right of custody. This right may nevertheless be outweighed by a showing of sufficiently grave detriment to the child's best interest to require that custody be awarded to a nonparent. Boyett v. Boyett, 448 So.2d 819 (La.App.2d Cir.1984). The civil code now provides that custody may be awarded to a nonparent if custody to the parent is detrimental to the child's best interest and custody to the nonparent would indeed serve his best interest. LSA-C.C. art. 146 B. The burden of proving that the parent's custody would be detrimental lies with the nonparent. Recknagel v. Roberts, 465 So.2d 844 (La.App.2d Cir.1985), writ denied 468 So.2d 570, 579 (La.1985). The trial court's determination on this score is entitled to great discretion, provided the forfeiture of custody is expressly determined and well supported. Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971); Burt v. McKee, 384 So.2d 489 (La.App.2d Cir.1980).
Ms. Gras has taken particular issue with the trial court's assessment of her amorous affairs. She contends that the jurisprudence is reluctant to characterize a mother as unfit by reason of adultery unless the adultery blooms into concubinage. Cleeton v. Cleeton, 383 So.2d 1231 (La. 1980) (on rehearing). We agree that Ms. Gras's situation has not been one of concubinage since neither of her lovers took up actual residence with her. We cannot deny, however, that Ms. Gras has displayed a lot of togetherness with her boyfriends in Chris Jr.'s presence. We share the trial court's stated concern for how this might affect her son who, at age five, is beginning to perceive things. See Nale v. Nale, 409 So.2d 1299 (La.App.2d Cir. 1982). We also note that Ms. Gras has professed her love for both men, and if either of the planned marriages had taken place, the moral detriment would have abated. Peters v. Peters, 449 So.2d 1372 (La.App.2d Cir.1984), and citations therein. Under all *1287 these circumstances, we consider the adultery issue close, but we cannot say the trial court abused its discretion. We emphasize, however, that adultery is not the only factor in this case.
There was substantial other conduct that led the trial court to remove custody from Ms. Gras. Chief among these is the alcohol and substance abuse problem. Despite her denials that this ever impaired her child-caring faculties and her assurances that the difficulty was behind her, the trial court obviously found that Chris Jr. must have suffered adversely while she was under the influence of Xanax. A pattern of chemical dependency is sufficient grounds to question a parent's fitness for custody. Read v. Fontenot, 392 So.2d 790 (La. App.3d Cir.1980). At one point, Ms. Gras's emotional problems led her to relinquish custody voluntarily.
Any further doubt is obviated by evidence of Ms. Gras's recent conduct. First she decided to quit her job. She has assumed a cavalier attitude toward getting a new one. Next is her carefree attitude toward securing new lodgings for herself and Chris Jr. This conduct threatens the family's stability and will work hardship on the child. Cf. Read v. Fontenot, supra. Finally, the earring incident shows a complete disregard for the boy's well-being at school and among his playmates. This strange conduct says more about Ms. Gras's attitudes than all her arguments on appeal.
In its oral reasons for judgment, the court expressed the conclusion that Ms. Gras has shown no stability or regularity in dealing with the pressures of life. Her reactions to stimuli have been unpredictable and immature. In forming this conclusion, the court considered her continued, indiscreet adulterous relationships when the child was present, the recent history of deep depression, alcohol and drug abuse, her insensitivity to the child's psychological well-being, and her uncertainty about employment and living conditions. These factors, taken together, fully justify the court's conclusion. On the evidence presented, the trial court's conclusions were not an abuse of discretion. Future conduct may reverse this unfortunate trend and entitle Ms. Gras to custody, but we think a court should not wait until detrimental circumstances have seriously affected a young child before it acts in the child's best interest.
We reiterate our position on a parent's right to custody. Recknagel v. Roberts, supra. We are sensitive to Ms. Gras's arguments that adultery or drug dependency alone may not undermine a parent's fitness for custody. But taking these factors together, and knowing their manifestations in other erratic conduct, we think they were sufficient to deny custody. This aspect of the trial court's judgment is affirmed.
In her first assignment, Ms. Gras contests the trial court's decision to admit certain medical records. We are reluctant to consider this assignment because we think Ms. Gras withdrew her objection to the introduction of these records. R.p. 93. Ms. Gras insists, however, that she was withdrawing her objection not to the introduction of the records into evidence but to the motion to compel her to produce them. Because the transcript is not totally clear, and her objection may have been so limited, we will address the argument. Under LSA-R.S. 13:3734, a patient has a privilege to refuse to disclose any communication made to a health care provider which enables the provider to diagnose, treat, prescribe or act for the patient except in certain instances. The exceptions include a contest over a will or a conveyance by a deceased, death cases, workers compensation suits and personal injury suits. Suits for separation, divorce and child custody are not listed as exceptions. The medical records of Ms. Gras are "communications" as defined by the statute. LSA-R.S. 13:3734 A(5); Arsenaux v. Arsenaux, 428 So.2d 427 (La.1983).
In Arsenaux, a wife sued for separation, claiming she was free from fault. The husband tried to prove that she had committed adultery by introducing medical records of an abortion. The wife claimed *1288 these records were privileged under the statute, and the Supreme Court agreed. The court noted, however, that if the wife's physical condition were an essential element of the case, an implied waiver could be inferred. 428 So.2d at 430.
Following this lead, our brethren on the fourth circuit recently decided a child custody case in which a parent's physical condition was at issue. In Dawes v. Dawes, 454 So.2d 311 (La.App. 4th Cir. 1984), the husband sued to amend a prior custody order and to implement a plan of joint custody. The wife caused to be issued a subpoena duces tecum covering the husband's hospitalization and medication records. The husband had the subpoena quashed under the statute. The court of appeal reversed. It noted that mental and physical health of the parties is relevant in custody matters. LSA-C.C. art. 146 C(2)(g). The Supreme Court denied writs. 457 So.2d 18 (La.1984). We find that article 146, which specifically deals with this kind of case, makes the medical records admissible and therefore supersedes the general provisions of LSA-R.S. 13:3734. Furthermore, the record clearly shows that Mr. Gras and the grandparents were aware of the physical and emotional problems that Ms. Gras had experienced and freely admitted at trial. The medical records do not really provide any new evidence and are thus cumulative. Under these circumstances, to compel their production or to admit them, if error, was harmless error. This aspect of the judgment is affirmed.
In her third and final assignment, Ms. Gras contends the trial court abused its discretion in awarding $300 a month child support when the grandparents testified and submitted affidavits that their costs for the child were only $215 a month. In setting child support, the trial court has very wide discretion. Ducote v. Ducote, 339 So.2d 835 (La.1976); Litton v. Lewis, 409 So.2d 1254 (La.App.2d Cir.1982). In order to reverse, we must find clear abuse. The grandmother testified that in her expense affidavit she had not included portions of the housenote and other household expenses that could be attributed to the child. Marcus v. Burnett, 282 So.2d 122 (La.1973); Nelms v. Nelms, 413 So.2d 1341 (La.App. 1st Cir.1982), writ denied 415 So.2d 944 (La.1982). We always prefer precise proof in money judgments but, under the circumstances, the award of $300 covers valid, includable expenses. It is not an excessive award and is not an abuse of discretion. This aspect of the judgment is affirmed.
For the reasons expressed, the judgment is affirmed at appellant's costs.
AFFIRMED.

ON REHEARING
Before HALL, JASPER E. JONES, FRED W. JONES, SEXTON and NORRIS, JJ.
PER CURIAM.
In her petition for rehearing, Ms. Gras has pointed to a few factual inaccuracies in our original opinion. Chief among these is that she was not admitted to a hospital in New Orleans in December 1984 for six weeks. She was in fact admitted to Charity and Jefferson Hospitals in New Orleans in March 1984 with heart palpitations, diagnosed as mitral valve prolapse and superventricular arrhythmia. Her relinquishment of custody for six weeks around Christmas 1984 was due to "serious problems with alcoholism." R.p. 62. Her breakup with Mr. Welch did not send her to the hospital, but required her to seek psychiatric treatment for about one year from Dr. L'Herrison, a psychiatrist in Shreveport. These inaccuracies, while regrettable, do not affect the outcome of the case. With these noted clarifications, the petition for rehearing is denied.
DENIED WITH CLARIFICATION.