614 So.2d 837 (1993)
Eveleen and Alton HUMPHREY, Plaintiffs/Appellants,
v.
Kimberly LaCaze HUMPHREY, Defendant/Appellee.
No. 24483-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1993.
*838 James E. Slaughter, Pineville, for plaintiffs/appellants.
Lunn, Irion, Johnson, Salley & Carlisle by Julia A. Mann, Shreveport, for defendant/appellee.
Before NORRIS, LINDSAY and BROWN, JJ.
NORRIS, Judge.
In an effort to gain custody of their seven-year-old grandson, Alton and Eveleen Humphrey filed both a Rule to Change Custody and a Rule for Contempt against their daughter-in-law, Kimberly Humphrey. They appeal the trial judge's order involuntarily dismissing their rules, replacing a definite visitation plan with reasonable visitation, and levying sanctions against them. For the reasons expressed, we affirm the judgment insofar as it dismisses the rules and imposes sanctions, but reverse and remand insofar as it modifies visitation.

FACTS
The present action is the culmination of years of conflict between the paternal grandparents and the mother of Jordy Humphrey, the minor. Jordy was born on December 19, 1985, the sole survivor of a set of twins. Jordy's father, Ricky Humphrey, was killed in an automobile accident shortly before Jordy's birth.
Jordy and his mother lived near the grandparents in Grant parish until December 1987 when he and his mother moved to Natchitoches parish. According to Eveleen Humphrey, prior to the move to Natchitoches, Jordy spent more time with her than he did with his mother. At some point during 1988, Kimberly Humphrey and Jordy moved again, this time from Natchitoches to Shreveport. Although Jordy no longer lived in the same community as his grandparents, they still saw him on a fairly frequent basis, regularly taking Jordy for the weekend so that his mother could work.
However, these weekend visits were not always well coordinated, and disagreements often arose over the times and places for exchanging Jordy. Thus, on December 8, 1989, shortly before Jordy's fourth birthday, the grandparents filed in the First Judicial District Court, Caddo Parish a Rule to Set Definite Visitation; Kimberly Humphrey apparently did not contest the rule. On February 5, 1990, Judge C.J. Bolin, Jr. granted visitation privileges to the grandparents on the second and fourth weekend of each month, on one-half of specified school holiday periods, and on two 10-day periods during the summer.
A year later, on March 22, 1991, when Eveleen went to pick up Jordy for a scheduled visit, she and Kimberly apparently had a disagreement over who would be responsible for transporting Jordy back to Shreveport. According to Eveleen, this disagreement resulted in a physical confrontation between her and Kimberly. Eveleen further claimed that Kimberly tried to pull Jordy out of the car, dislocating his arm in the process. Nevertheless, Eveleen managed to speed away with Jordy.
*839 Following this incident, the grandparents failed to return Jordy to his mother. Instead, on March 27, 1991, they filed a "Petition for Change of Custody and Injunctive Relief" in Grant parish. On the same date, Judge B.G. Lutes of Grant Parish issued an ex parte order awarding temporary custody of Jordy to the grandparents pending a rule to show cause why permanent custody should not be awarded to them; he also issued a temporary restraining order against Kimberly Humphrey, restraining her from harming, molesting, or harassing Jordy or the grandparents.
Subsequently, on April 1, 1991, Kimberly Humphrey filed a "Rule for Child Support, Termination of Visitation, Contempt, Restraining Orders, and Writ of Habeas Corpus" in Caddo parish. She also filed a Declinatory Exception of Improper Venue in Grant parish. On April 3, 1991, Judge Lutes issued an order maintaining the exception. The order further provided that the proceedings be transferred to Caddo parish and that all interim orders (the temporary custody award) be vacated. Jordy was subsequently returned to his mother.
After the grandparents' case was transferred to Caddo parish, it was consolidated with Kimberly's on July 25, 1991. On September 4, 1991, Kimberly and Jordy moved to Colorado. This move prompted the grandparents to file a Rule for Contempt, alleging that they were now denied the opportunity for visitation in violation of the definite visitation plan. The grandparents also filed a new Rule to Change Custody in which they stated that Kimberly was "physically abusing, neglecting, and subjecting the minor child to sexual molestation." They further stated in the rule that they were "prepared to submit voluminous documents as well as testimony to attest to the fact that the minor is in grave danger." (R.p. 61).
The hearing on the rules was held before Judge Gary Bowers on February 18-19, 1992, almost a year after they were filed. Kimberly Humphrey passed on her Rules for Child Support and Contempt. Her Writ of Habeas Corpus was rendered moot by the return of Jordy. Thus, remaining before the court were both the grandparents' Rule to Change Custody and Rule for Contempt and Kimberly Humphrey's Rule for Termination of Visitation.
Most of the grandparents' testimony was supplied by Eveleen Humphrey. She detailed numerous instances of alleged abuse and neglect on the part of Kimberly Humphrey dating back to 1986. According to Eveleen Humphrey, in late 1986, Kimberly left Jordy alone with his nine-year-old cousin while she went to a club. After getting into some sort of trouble at the club, she returned home. Shortly thereafter, two women came bursting through the door, knocking down Jordy and stepping on him. According to Eveleen, Kimberly pulled a gun on the two women as Jordy cowered in the bathroom.
Eveleen Humphrey further alleged that in April of 1987, she witnessed Kimberly sexually abuse Jordy. She stated that on this occasion, she went into Kimberly's house surreptitiously and spied on Kimberly as she lay naked on her back in the bathtub. She claimed that Kimberly, unaware of her presence, was holding Jordy underneath his arms and rubbing his body back and forth across her own from vagina to breasts. According to Eveleen Humphrey, the expression on Kimberly's face distinguished the incident from a mere bath. Although Eveleen Humphrey claimed that witnessing this incident repulsed her to the point of vomiting, she said she never directly confronted Kimberly about it because she "tried to be nice." (R. p. 159). She further characterized as sexual abuse Kimberly's practice of permitting Jordy to walk around naked outside until he was two and a half years old.
Eveleen Humphrey also testified that Kimberly physically abused Jordy on at least two other occasions in 1987. She stated that in December of that year Kimberly caught Jordy eating a tootsie pop sucker before dinner. She pulled the sucker out of his mouth and hit him in the mouth with it, chipping a tooth in the process. The grandparents introduced a blurry photo at trial which purportedly depicted the chipped tooth and its subsequent decay. *840 (Ex. P-2). Later that same month, according to the grandmother, Kimberly intentionally pushed Jordy off a porch with a couple of garbage bags. Jordy fell the distance of four steps, hitting his head on the concrete. She further stated that Kimberly took Jordy to the doctor; however, the grandparents did not introduce any medical testimony or records to substantiate the injury.
On December 21, 1987, shortly after the alleged porch incident, Eveleen Humphrey reported Kimberly to the Office of Human Development's Division of Children, Youth, and Family Services ("OHD"). The records of the OHD, introduced by the trial judge without objection, show that a caseworker visited Kimberly and Jordy on the very day of the report. (Ct. ex. # 3). Curiously, in the contemporaneous report to OHD, Eveleen Humphrey described the sucker and bathtub incidents differently than she did at trial. She reported only that Kimberly permitted Jordy to bathe with her and that he played with her nipples and pubic hair. The caseworker noted that Kimberly admitted she bathed with Jordy because she was afraid to let him bathe alone. She further noted that Kimberly said when she bathed with Jordy, she placed a towel over the front of her body.
In regard to the sucker incident, Eveleen reported only that Kimberly had grabbed the sucker out of Jordy's mouth, maybe chipping a tooth; she made no allegation that Kimberly had hit him with the sucker. When the caseworker asked Kimberly about this incident, she admitted only that she took the candy away because it was very near supper time.
The OHD records show that, as part of the investigation of Eveleen's report, the caseworker interviewed a prominent member of the church to which both Kimberly and the grandparents belonged. He maintained that Kimberly was an excellent mother and that Eveleen wanted Jordy because he so closely resembled her deceased son. After examining Jordy, the caseworker noted that she could detect no lumps on Jordy's head and that he appeared neat and clean, well nourished and healthy.
Eveleen Humphrey made no allegations of abuse or neglect arising in 1988. However, she did testify about incidents occurring in 1989. She stated that during this period of time, Kimberly brought Jordy with her to the Cub, a night club at which Kimberly worked. She also stated that in August 1989 she noticed two oozing burns on Jordy's right leg. According to her testimony, when she questioned Kimberly about the burns, Kimberly admitted that she had intentionally burned Jordy on a camping trip seven days before. Kimberly explained to her that Jordy was playing with a stick in the campfire. When he refused to stop, she took the stick and pressed it against his leg in order to show him that it was indeed hot. The grandmother further testified that at some time before December 1989, Kimberly sent her several letters offering to relinquish custody of Jordy to the grandparents.
On August 14, 1989, Eveleen Humphrey filed a second report with the OHD alerting the office to the burns on Jordy's leg. However, when a caseworker from the OHD examined Jordy's legs only two days later, she detected only "small non-configural injuries" and characterized the injuries as "resulting from accidental injury as it had no definite configuration that would indicate abuse." (Ct. ex. # 3). The caseworker further noted that Jordy gave no indication of abuse or neglect and specifically denied any maltreatment by his mother. After interviewing both Jordy's daycare teacher and one of Kimberly's co-workers, the OHD once again closed the case on October 27, 1989, noting that its investigation had found no evidence of abuse or neglect. In its closing remarks, the OHD noted: "This is apparently the second complaint made by the same reporter in an effort to harass the client. Future reports by this reporter should probably be very carefully screened." (Ct. ex. # 3).
Eveleen Humphrey stated at trial that she could not recall any instances of neglect or abuse arising in 1990, but she alleged several arising in 1991. With regard to neglect, she stated that Kimberly would often not go home until late, and *841 Jordy would be left outside alone. She testified that Jordy would often call her collect from a pay phone three blocks from his home while he waited for his mother to return. According to the grandmother, some of these calls were made as late as 8:00 p.m.[1] The grandmother also stated that Kimberly had pinned a key into Jordy's coat pocket so that he could let himself into the apartment.
The OHD records reveal that when Kimberly was asked about the telephone calls she admitted that Jordy would sometimes disappear while playing and that she would find him using the pay phone at the guard shack in their residential complex. Kimberly also stated that she was not opposed to Jordy calling his grandmother and that she would have permitted him to make the calls from their house. She believed, however, that Eveleen had previously shown Jordy how to call collect from the pay phone as he would not have known how to place such calls otherwise.
As for physical abuse, Eveleen stated that when she went to pick up Jordy for the Easter vacation, she and Kimberly had a disagreement over who was responsible for transporting Jordy back to Shreveport after Easter. According to Eveleen Humphrey, the disagreement led to a physical assault in which Kimberly bit Eveleen's hand to the bone and tried to pull Jordy out of the car, hurting his arm in the process. She claimed that she took Jordy to a doctor who determined that his arm had been dislocated/relocated, but she offered no medical records or testimony into evidence to substantiate this claim. Following this incident, she filed assault charges against Kimberly.
Eveleen Humphrey also testified that when she picked up Jordy for the next scheduled visit following the Easter vacation, he was nauseated and had a lump on his head which hurt him so much that he could not rest his head against the back of his seat. She stated that Jordy cried all night but that he refused to reveal how he had been hurt. She said that she took him to a hospital emergency room but again failed to introduce evidence to that effect.
Finally, Eveleen Humphrey stated that during a subsequent visit, Jordy complained about a rectal problem, had difficulty "holding his urine," and cried with pain. She said that she examined his groin and noticed that his testicles were swollen. When she questioned Jordy, he acted embarrassed and hid his head under a pillow. However, according to his grandmother, he agreed to draw a picture of what had happened on a chalkboard. A copy of the drawing was admitted into evidence. (Ex. P-1). According to Eveleen Humphrey, Jordy later explained that Dawn LaCaze,[2] Kimberly Humphrey's niece who was living with Kimberly and Jordy at the time, had put her hands on his penis and made it "go back and forth." However, Jordy himself did not testify, and there was no expert testimony to interpret the drawing.[3]
Eveleen Humphrey stated that she took Jordy to Dr. Michael Manuel to check for a possible urinary tract infection, and that Dr. Manuel referred Jordy to Dr. Joseph Ray Hollier in Alexandria. Neither of the doctors was called to testify, nor were their medical findings introduced into evidence.
On May 25, 1991, Eveleen Humphrey filed a third complaint with the OHD, reporting the alleged sexual abuse. She also reported the arm dislocation, the lump on Jordy's head and accompanying nausea, and the occasions when Jordy was left at home unsupervised. An OHD caseworker interviewed Jordy. He denied that his penis was hurt or that he had been abused. He specifically denied any inappropriate touching and never indicated any inappropriate behavior on the part of Dawn LaCaze. *842 He did admit that Dawn had once accidently touched him on top of his pajamas while he was hiding in a closet during a game of hide and seek. When shown a copy of his drawing, he explained that he had been having nightmares and that the drawing depicted a water gun and a rope connecting him to Dawn. Dawn LaCaze, when interviewed by the OHD caseworker, also denied that she had ever fondled Jordy. Furthermore, an OHD interview with Jordy's teacher revealed that she had not seen anything to indicate that he had been a victim of abuse. The teacher stated that Jordy had not been going to the bathroom more frequently, nor had he complained of any abdominal or genital pain.
The OHD records show that counseling psychologist Donita Gothard performed a psychological examination of Jordy on June 18, 1991. In her report to OHD, she stated:
On the basis of present information and limited contact with Jordy, there is no indication that he has been sexually abused. He at no time appeared defensive or evasive and is [sic] is felt that he would have obediently acknowledged anything of that nature. Jordy's desire to please might be kept in mind when considering statements he reportedly gives to persons who may be unskilled and biased in working with children. (Ct. ex. # 3).
On February 19, 1992, the OHD once again closed Jordy's case, indicating that it was unable to uncover any indication that any abuse had occurred.
In September 1991, Kimberly and Jordy moved from Shreveport to Colorado. Upon learning this, Eveleen Humphrey called the Police Department in Aurora, Colorado and reported that Jordy had not been going to school and that Kimberly had a history of child abuse. The grandmother attempted to justify this report by stating that she had called Jordy's school and was told that Jordy was absent that day and possibly tardy the day before. Her report apparently prompted the police to conduct a strip search of Jordy. (R. p. 319). Eveleen Humphrey further testified that she and Alton Humphrey made an unannounced visit, accompanied by two Colorado policemen, to Kimberly and Jordy's home. She admitted that Kimberly permitted them to take Jordy for nearly a day and a half visit.
In addition to Eveleen Humphrey's testimony, her husband Alton Humphrey and her daughter Doborah Corbitt both testified that they had witnessed Kimberly Humphrey hit Jordy in the mouth with the sucker. They also both testified that they had seen the burn marks on Jordy's leg. Alton Humphrey stated that he had seen Kimberly take Jordy to the Cub on one occasion and that he had also seen the house key which Kimberly had pinned to Jordy's coat pocket. Deborah Corbitt stated that she knew Jordy's arm had been dislocated and that Eveleen Humphrey had taken him to an emergency room once because his head was hurting. She further testified that when Jordy was approximately two years old, she witnessed Kimberly rub a "more than normal amount" of lotion on his penis and comment that his penis was cute. (R. pp. 260-61). She also stated that she witnessed Kimberly strike Jordy on the top of his head and bite another child who had just bitten Jordy. However, as the trial judge noted, the mother of the allegedly bitten child was interviewed by the OHD and did not report this.
Corey Corbitt, Jordy's 13-year-old first cousin, testified that he had seen Kimberly whip Jordy for refusing to go to bed. He also testified that he had seen Kimberly drinking alcohol.
Ruth Humphrey, Jordy's paternal great-grandmother, testified that she had never seen Kimberly sexually abuse Jordy. She did state, however, that she had seen Kimberly drink excessively in 1987. She further stated that Kimberly had told her that she would give Tylenol to Jordy to make him sleep during the day, but she admitted that she had never actually seen Kimberly do so. She also stated that she too had seen the burns on Jordy's leg.
Prior to the close of his case in chief, the grandparents' counsel called Kimberly Humphrey on cross. Kimberly stated that she and Jordy had moved to Colorado in *843 September 1991 and that she had not gotten the court's permission to move. She denied that she had ever written letters to the grandparents expressing a desire to relinquish custody of Jordy. When presented with several letters, she recognized only one as her handwriting. This letter was admitted into evidence; the remaining letters were proffered. (Ex. P-3 and Proffer # 1). By counsel's own admission, the single letter admitted into evidence was offered for the purpose of identifying Kimberly Humphrey's handwriting and signature; its content did not bear on the issues of neglect or abuse. (R. p. 305).
At the close of the grandparents' case, counsel for Kimberly Humphrey moved for an involuntary dismissal of the Rule to Change Custody pursuant to La.C.C.P. art. 1672 and for sanctions pursuant to La. C.C.P. art. 863. Judge Bowers granted both motions, noting that the grandparents had failed to carry their burden of proof and had subjected Kimberly Humphrey to a long history of harassment. The trial judge also applied the involuntary dismissal to the Rule for Contempt, finding that Kimberly Humphrey was under no obligation to obtain the court's permission prior to moving Jordy out of state. The judge also deleted and vacated the provisions of the specific visitation plan, substituting in its place reasonable visitation to be determined by the mother. The grandparents appeal, asserting four assignments of error. Kimberly Humphrey did not answer the appeal but responds and seeks sanctions for frivolous appeal.

CUSTODY
The grandparents essentially assert that the trial court erred in involuntarily dismissing their Rule to Change Custody. We disagree.
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party may move for a dismissal of the action as to him on the ground that upon the facts and law the plaintiff has shown no right to relief. La.C.C.P. art. 1672 B.
Article 1672 B requires a judge, at the close of plaintiff's case, to weigh and evaluate the evidence and render a decision based upon the applicable evidentiary standard without any special inferences in favor of the opponent to the motion. Financial Corp. v. Estate of Cooley, 447 So.2d 594 (La.App. 3d Cir.1984); Bradley v. Hunter, 413 So.2d 674 (La.App. 3d Cir. 1982), writ denied 415 So.2d 952 (1982). When a party fails to carry his burden of proof there is no necessity for the opposing party to rebut insufficient evidence. Harvill v. Casey, 461 So.2d 373 (La.App. 2d Cir.1984), writ denied 464 So.2d 318 (1985). But see Owen v. Gallien, 477 So.2d 1240 (La.App. 3d Cir.1985). Cf. Soignet v. Soignet, 546 So.2d 541 (La.App. 1st Cir.1989).
The proper inquiry in the present case is whether the grandparents' evidence establishes by convincing proof that a change of custody is warranted. Lewis v. Taylor, 554 So.2d 158 (La.App. 2d Cir. 1989), writ denied 554 So.2d 1237 (1990); Merritt v. Merritt, 550 So.2d 882 (La.App. 2d Cir.1989); Hughes v. McKenzie, 539 So.2d 965 (La.App. 2d Cir.), writ denied 542 So.2d 1388 (1989). Civil Code article 146B sets forth a two-tiered standard which must be met before a natural parent may be denied custody of his or her child in favor a nonparent: the trial court must determine (1) that an award of custody to the parent would be detrimental to the child, and (2) that the award to a nonparent is required to serve the best interest of the child. Lewis, supra; Merritt, supra; Hughes, supra.
The burden of proving that the parent's custody would be detrimental to the child lies with the nonparent. Lewis, supra; Hughes, supra; Gras v. Gras, 489 So.2d 1283 (La.App. 2d Cir.), writ denied 493 So.2d 1222 (1986). The parent's paramount or superior right of custody can only be outweighed when convincing evidence establishes that parental custody places the child in grave detriment and that the child's best interest requires an award to a nonparent. See Lewis, supra; Boykin v. Corless, 488 So.2d 1153 (La.App. 2d Cir.1986); *844 Boyett v. Boyett, 448 So.2d 819 (La.App. 2d Cir.1984).
In the present case, the grandparents introduced into evidence only three items of physical evidence: Jordy's drawing, a photo of Jordy, and a letter written to them by Kimberly. Although the grandparents contend that Jordy's drawing depicts Dawn LaCaze placing her hand on Jordy's genitals, they provided no expert witness to interpret the drawing. Jordy himself interpreted the drawing for the OHD case worker as depicting him and Dawn with a water pistol and a rope. He specifically denied that the line connecting Dawn to him was her hand on his "privates." As previously mentioned, although the grandparents claimed to have audio tapes of Jordy interpreting the drawing, the alleged tapes were not introduced into evidence. The trial judge summed up the usefulness of the drawing by noting that it "doesn't tell me anything." (R. p. 302).
The photograph of Jordy was introduced for the purpose of showing a tooth which had purportedly decayed as a result of Kimberly's striking it with a sucker. However, the photograph was of such poor quality that the trial judge could not detect a cavity even if one existed. (R. p. 305).
Finally, the letter written by Kimberly to the grandparents was introduced merely as a means to identify her handwriting and signature for comparison with other letters which purportedly contained relevant subject matter. However, since Kimberly denied writing the other letters and the grandparents failed to secure the testimony of a handwriting expert, the grandparents were unable to lay a proper foundation for the admission of the other letters into evidence. Thus, the single letter admitted into evidence was irrelevant to the issues of abuse or neglect.
The primary evidence of abuse or neglect presented at trial was the testimony of Eveleen Humphrey. This was only partially corroborated by the testimony of her husband Alton Humphrey, their daughter Deborah Corbitt, their grandson Corey Corbitt, and Alton Humphrey's mother Ruth Humphrey. Given the close relationship of the witnesses, it was certainly within the trial court's discretion to consider the potential for bias. Indeed, a plaintiff's uncontroverted testimony should be taken as true only in the absence of circumstances in the record which cast a suspicion on the reliability of the testimony and establish a sound basis for its rejection. See Johnson v. Insurance Company of North America, 454 So.2d 1113 (La.1984); Fuller v. Wal-Mart Stores, Inc., 519 So.2d 366 (La.App. 2d Cir.1988); Pool v. G.N. Batteries, Inc., 480 So.2d 898 (La.App. 2d Cir.1985).
As the trial judge recognized, the instant record contains more than ample facts to cast suspicion on the testimony of the grandparents and their witnesses. Although Eveleen Humphrey claimed to have taken Jordy to a doctor on at least 12 different occasions, the grandparents offered absolutely no medical testimony, medical reports, depositions, or any other verification that an injury had indeed occurred. If the grandmother did take Jordy to the doctor for medical treatment as often as she claimed, it would be somewhat unusual for her not to offer medical evidence of some nature at trial.
Furthermore, although much of the testimony offered by the grandparents and their witnesses related to events predating the December 1989 filing of their Rule to Set Definite Visitation, those pleadings made no mention of any neglect or abuse. This is curious given that one of Eveleen Humphrey's stated reasons for seeking a definite visitation plan was so that she could monitor Jordy's injuries. (R. p. 141).
Moreover, each of the reports filed by Eveleen Humphrey with the OHD alleging neglect and/or abuse was fully investigated by the agency and found to be without merit. The OHD caseworker concluded that the reports were made "in an effort to harrass the client [Kimberly Humphrey]" and that future reports filed by the grandmother should "probably be very carefully screened." (Ct. ex. # 3). Similarly, the psychologist who examined Jordy concluded that there was no indication that he had been sexually abused. Thus, the only real evidence of neglect or abuse introduced at *845 trial was the self-serving testimony of Eveleen Humphrey with occasional corroboration from her close family members.
In child custody cases, the decision of the trial court is to be given great weight and overturned only where there is clear abuse of discretion. Thompson v. Thompson, 532 So.2d 101 (La.1988); Merritt v. Merritt, 550 So.2d 882 (La.App. 2d Cir.1989). Given the factors discussed above, we cannot conclude that the trial court was clearly wrong or manifestly erroneous in rejecting the grandparents' witnesses as not credible, and thus finding that the grandparents had failed to prove by convincing evidence that parental custody would be detrimental to the child.

CONTEMPT
The trial judge also involuntarily dismissed the grandparents' Rule for Contempt wherein they alleged that, by moving Jordy to Colorado, Kimberly had denied them the opportunity for visitation in violation of the specific visitation plan. The grandparents contend that Kimberly moved to Colorado in order to thwart visitation and that the trial court erred in failing to hold her in contempt. See C.C.P. art. 224(2), (10).
In their brief, the grandparents argue that Kimberly repeatedly denied them visitation. However, there is no support for this allegation in the record. Indeed, the record indicates that when the grandparents arrived unannounced in Colorado, Kimberly permitted them to take Jordy for a day and a half visit.
The real thrust of their argument is that Kimberly's out-of-state move constitutes noncompliance with the visitation plan. However, as the trial judge noted, the plan did not require Kimberly Humphrey to obtain court authority before she moved. Kimberly is the sole custodian of Jordy; this is not a situation involving a joint custody order. Cf. Broomfield v. Broomfield, 283 So.2d 839 (La.App. 2d Cir.1973). Hence, the trial judge did not err in refusing to hold Kimberly Humphrey in contempt. This assignment of error is without merit.

VISITATION
The grandparents further assert that the trial court erred when it replaced the existing definite visitation plan with reasonable visitation to be determined by the mother.
The trial court correctly decided not to grant Kimberly Humphrey's Rule for Termination of Visitation, finding that visitation with the grandparents was in the best interest of the child. However, it did vacate the provisions of the visitation plan which specified definite times for visitation: every other weekend, various holidays, and summer vacations. In place of the specific visitation plan, the trial judge left only reasonable visitation. The court stated:
This means that if you want to regain your position of having some time with this child, Mr. and Mrs. Humphrey, you're going to have torather than getting into a confrontation situation, or doing anything that results in harassmentyou're going to have to work with Ms. Humphrey over here and convince her....
So it's not totally eliminatedthe right to visitationI'm not terminating it, but I'm not leaving it with specific provisions in there, which means that the mother of this child has a great deal of discretion, as far as I'm concerned, in when the visitation is going to take place, and the terms and conditions under which it's going to take place. (R. p. 320-21).
Civil Code article 132 provides, in relevant part, that:
Any relative, by blood or affinity, not granted custody of the child may be granted reasonable visitation rights if the court finds that it is in the best interest of the child.
La.R.S. 9:572 A similarly provides that:
If one of the parties to a marriage dies... and there is a minor child or children of such marriage, the parents of the deceased... may have reasonable visitation rights to the child or children of the marriage during their minority, if the court in its discretion finds that such *846 visitation rights would be in the best interest of the child or children.
While these provisions establish only "reasonable" visitation rights on behalf of grandparents, the statutory benchmark for granting such visitation is clearly the best interest of the child. It is apparent that the grandparents love Jordy, but have demonstrated a long history of animosity with Kimberly. Under these circumstances, it can scarcely be said that unspecified reasonable visitation is in the best interest of the child. Indeed, it was the parties' inability to coordinate visitation which prompted the issuance of the specific visitation plan in the first place. There is no reason to believe that, following this bitter custody contest, the parties would be any more capable of agreeing on the specifics of visitation than they were before. Indeed, the likelihood of disagreement, with the child being caught in the middle, appears even greater now. Under these circumstances, we conclude that the trial court abused its discretion in replacing a specific visitation plan with reasonable visitation depending solely on the mother's discretion.
We agree with the trial judge, however, that the provisions of the existing specific visitation plan are unworkable given the change in circumstances which resulted from the child's move to Colorado. Certainly, visitation every other weekend would no longer be a reasonable provision of the plan. In any event, the best interest of the child remains the major concern in determining the appropriate provisions of the specific visitation plan.
The record does not reveal the child's current school situation, the schedules of the mother and grandparents, or the possible effect on the child of being a great distance from his mother. For this reason, we are unable to make a finding as to the details of the specific visitation plan. We therefore reverse and vacate that part of the judgment replacing the specific visitation plan with reasonable visitation and remand this case for determination of specific visitation provisions reflecting the change in circumstances resulting from the child's move to Colorado.

SANCTIONS
The trial court granted Kimberly Humphrey's motion to impose sanctions, specifically finding that the grandparents had filed this action for the purpose of harassing Kimberly. (R. p. 81). Thus, in addition to court costs, it ordered the grandparents to pay the following expenses:

1. Airfare for Kimberly
 Humphrey $ 363.00
2. Attorney fees paid to
 previous attorney, Ted
 Johnson $1000.00
3. Attorney fees for Attorney
 Julia A. Mann $6780.00
4. Expenses to Attorney
 Julia A. Mann $ 774.20

We note that neither the grandparents nor their attorney appeared at the sanctions hearing on May 13, 1992.
La.C.C.P. art. 863 provides, in relevant part:
[T]he signature of an attorney or party shall constitute a certification by him that he has read the pleading; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact; that it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
. . . . .
D. If, upon motion of any party or upon its own motion, the court determines that a certification has been made in violation of the provisions of this Article, the court shall impose upon the person who made the certification or the represented party, or both, an appropriate sanction which *847 may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, including a reasonable attorney's fee.
The obligation imposed by article 863 upon litigants and their counsel is to make an objectively reasonable inquiry into the facts and law. Subjective good faith will not satisfy the duty of reasonable inquiry. Diesel Driving Academy, Inc. v. Ferrier, 563 So.2d 898 (La.App. 2d Cir. 1990); Murphy v. Boeing Petroleum Services, 600 So.2d 823 (La.App. 3d Cir.1992); Barry W. Miller, APLC v. Poirier, 580 So.2d 558 (La.App. 1st Cir.1991).
The "abuse of discretion" standard of review applies to the trial court's finding that a violation has occurred and to its determination of the amount and type of sanction imposed. Ferrier, supra.
In their pleadings, the grandparents stated that Kimberly Humphrey was "physically abusing, neglecting, and subjecting the minor child to sexual molestation." After noting the thorough investigation and conclusions of the OHD, the trial judge found that the grandparents' claims were "totally frivolous, totally without any basis and unwarranted." He further found that they were filed for an improper purpose, harassment. Given that the record discloses absolutely no effort on the part of the grandparents to inquire into the underlying facts of their claim by medical depositions, the subpoena of medical records and OHD findings, or consultation with child care experts, we cannot say that the trial judge abused his discretion in finding as he did.
In Montalvo v. Montalvo, 592 So.2d 904 (La.App. 5th Cir.1991), a mother reported to the child protection authority that the father had sexually abused the minor child during visitation. The matter was investigated by the authorities and deemed to be unfounded. Nevertheless, the mother repeated the allegations of sexual abuse in a motion for a temporary restraining order. The trial court, finding that the allegations were "`frivolous and intended to confuse the court,'" imposed $500.00 in sanctions together with $12,826.00 in legal fees, $3,512.96 expenses of the husband, $740.00 private investigator fees, $800.00 airfare for the husband's Virginia attorney, and various other unspecified expenses. The Louisiana Fifth Circuit Court of Appeal upheld the sanctions, stating:
LSA-C.C.P. art. 863 D & E authorizes the court to impose sanctions for the filing of any pleading interposed for any improper purpose. In the instant case, the wife made allegations of sexual abuse identical to those made previously in the child's home state of Virginia. When confronted with the fact that these allegations were fully investigated and deemed to be unfounded, she offered no evidence to show that the investigation was ineptly performed or that the conclusion was incorrect. Based on these facts we find no manifest error in the trial court's finding[.]
Id. at 906.
As in Montalvo, the grandparents in the instant case offered no evidence, other than self-serving testimony, that the OHD investigation was deficient in some respect or that its conclusions were incorrect. Furthermore, the grandparents represented to the court in their pleadings that they were prepared to submit "voluminous documents" as well as testimony to attest to the fact that the minor is in "grave danger." Yet, as previously discussed, they introduced into evidence only a drawing, a photo, and a letter, none of which suggested that the child was in grave danger at the time their pleadings were filed. Under these circumstances, we cannot conclude that the trial court abused its discretion in imposing sanctions.
In her response to the grandparents' appeal, Kimberly Humphrey seeks further sanctions under article 863, asserting that this appeal was taken for improper purposes and merely continues the pattern of harassment. She also relies upon La. C.C.P. art. 2164 which permits the appellate court to award damages for a frivolous appeal.
In Ferrier, supra, a rehearing panel of this court issued a per curiam opinion *848 holding that an appellate court could not remand under article 863 to allow sanctions to be increased for defending against an appeal by a litigant who was sanctioned below. In so holding, we followed the Supreme Court's decree in Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), holding that if an appeal of a sanction is deemed to be frivolous, the appellate court should not remand under the sanction article but should award damages under the article authorizing such an award for a frivolous appeal.
Thus, if a party is to be granted damages for frivolous appeal, she must be entitled to such damages under article 2164. A court may award damages for frivolous appeal under article 2164 only where the party seeking such award has either filed an appeal or an answer to an appeal. Dull v. Gibbs, 577 So.2d 806 (La. App. 2d Cir.1991); Succession of Bleuler, 600 So.2d 791 (La.App. 5th Cir.1992); Spellman v. Desselles, 596 So.2d 843 (La. App. 4th Cir.), writ not considered 600 So.2d 601 (1992). In the instant case, Kimberly Humphrey neither filed nor answered the appeal. She merely filed a motion to dismiss the appeal, which was denied by a panel of this court, and requested damages in brief. Neither of these actions is sufficient to warrant consideration of her claim for damages. Bleuler, supra; Sears, Roebuck & Co. v. Appel, 598 So.2d 582 (La. App. 4th Cir.1992). Thus, Kimberly Humphrey's claim for damages is not properly before this court and will not be considered. La.C.C.P. 2133; Dull, supra.

CONCLUSION
For the reasons expressed, that part of the trial court's judgment replacing the specific visitation plan with reasonable visitation is reversed, vacated, and remanded for determination of specific visitation provisions in light of the change in circumstances. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed to plaintiffs-in-rule, Alton and Eveleen Humphrey.
AFFIRMED IN PART; VACATED IN PART AND REMANDED.
NOTES
[1] The grandmother offered the telephone records as evidence. However, the records were ruled inadmissible as she had made handwritten comments on them. (R. pp. 148-49).
[2] Dawn LaCaze is the 15 year-old daughter of Kimberly's sister. She is in foster care and was placed in Kimberly's home on a temporary basis pending a home study by the OHD. At the time of trial, she was no longer living with Kimberly and Jordy.
[3] The grandparents purportedly had audio tapes of Jordy interpreting the drawing. However, they never attempted to introduce the tapes into evidence.