STEWART, J.
11 Cecil “Tom” Janway, Jr., and Rosalyn Janway (hereinafter referred to as “the Janways” or “Tom” and/or “Rosalyn”) are appealing a trial court judgment granting Matthew Brian Jones’ (hereinafter referred to as “Matthew”) motion for involuntary dismissal and denying their motion for visitation. For the reasons expressed, we affirm the judgment.
FACTS
The Janways’ daughter, Wendi Janway Jones (hereinafter referred to as “Wendi”), married Matthew on November 30, 2002. Soon thereafter, the couple moved to Houston, Texas. In January 2004, Wendi, who was born with Common Variable Immune Deficiency, moved back to her parents’ home in Monroe, Louisiana, to recover from a medical procedure. Matthew later relocated to Monroe in August 2004.
On August 2, 2006, Wendi gave birth to them daughter, Z.J. Soon after the birth, Wendi suffered from complications, and had to return to the hospital for approximately two weeks. Wendi’s health continued to decline, and Tom, Rosalyn, and Matthew shared the responsibility of caring for Z.J.
Matthew, Wendi, and Z.J. moved out of the Janways’ home when Z.J. was approximately 11 months old. Wendi primarily cared for the child, but Rosalyn assisted Wendi in Z.J.’s care when Wendi was ill.
On October 9, 2009, Wendi died of complications from her disease. After her death, Z.J. stayed with the Janways for approximately four to six weeks. She then moved back in with Matthew, but the Jan-ways continued to care for her during the day while Matthew was at work. In August 2010, Z.J. began attending day school *715 at the First United Methodist Church in I^Monroe from 8:30 a.m. to 11:30 a.m. Rosalyn assumed the responsibility of picking her up from day school, and caring for her until Matthew got off work.
In September 2010, Rosalyn made the decision to leave Z.J. after school, without consulting Matthew, so that she could participate in “lunch bunch,” an afternoon childcare program. After this incident, Matthew met with the Janways to inform them that he should be consulted before any changes in Z.J.’s schedule were made. At this meeting, he also requested that Rosalyn refrain from talking about him or his family in Z.J.’s presence. Even though Matthew was upset that Rosalyn did not inform him of Z.J.’s participation in this afternoon childcare program, he chose to continue to bring her to the Janways’ home daily.
In November 2010, Z.J. informed the Janways that Matthew was dating a woman named “Leanne.” Concerned, they called a meeting with him to discuss Z.J.’s exposure to overnight guests of the opposite sex. They also suggested that he spend more time with his daughter. Following this meeting, Rosalyn began informing friends and neighbors that Matthew was dating and “shacking up” with “Leanne.”
In December 2010, Rosalyn planned a cruise for her, Tom and Z.J. Matthew asserts that he was not consulted while this vacation was planned. However, he did allow Z.J. to go. When they returned from the trip, Matthew was not contacted for several hours to let him know they were home. Later that month, Rosalyn asked Matthew if her sister could stay at his home during the New Year’s holiday. Matthew, who was going to be |3out of town for the holiday, agreed. He left the front door unlocked and left a key inside the house for Rosalyn’s sister to use. When Rosalyn went to Matthew’s house with her sister, she became upset when she discovered that Matthew had changed the locks. She also took property from the home, including a Patagonia blanket, cookbooks, T-shirts, jackets, and a picture of Matthew and Wendi. After discovering that these items were missing, Matthew contacted the Janways to inform them that he was coming to their home to retrieve Z.J.’s backpack and birth certificate. He also told them that they would “no longer have influence on Z.J.” Rosalyn then demanded to pick up her furniture from Matthew’s house.
Soon thereafter, Rosalyn emailed Z.J.’s teacher, making derogatory statements about Matthew. Rosalyn called Matthew’s place of employment, the Department of Transportation and Development, in an attempt to have him terminated. She contacted the Executive Board of the Department of Transportation and Development to inform them that he was “dating a contractor,” and that her husband wanted to know if that was a conflict of interest. Rosalyn admitted that she knew that Matthew could lose his job when she made these phone calls. Tom admitted that pri- or to Rosalyn making the call, he thought that if Matthew lost his job, he could not support his daughter.
As a result of Tom and Rosalyn’s actions, Matthew discontinued all visitations between Z.J., Tom and Rosalyn in January 2011.
On January 11, 2011, Tom and Rosalyn filed a Petition for Grandparent Visitation. On January 18, 2011, Tom and Rosalyn went to | .¡Matthew’s house unannounced. They also began attending Z.J.’s gymnastics and dance classes, without Matthew’s consent. When Matthew changed the date of her gymnastics class, Rosalyn contacted the gymnastics studio to ask for the new day and time. When Rosalyn learned that *716 Z.J. was playing soccer, she contacted the soccer organization to find out what team Z.J. was on and the time of her games. After these events and many others occurred, Matthew sought and obtained a Temporary Restraining Order prohibiting Tom and Rosalyn from coming in contact with Z.J. or himself.
After Matthew obtained the restraining order, Tom and Rosalyn filed a Rule seeking the legal and physical custody of Z.J., contending that she would suffer substantial harm by residing with Matthew.
The hearing regarding the Janways’ petition commenced on April 13, 2011. At the close of the Janways’ case, counsel for Matthew moved for an involuntary dismissal. The trial court found that visitation would not be in the best interest of the child and denied the Janways’ motion for visitation. Matthew’s motion for involuntary dismissal was granted. The trial court also dismissed the Janways’ rule for custody. The Janways appeal.
LAW

Involuntary Dismissal

In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the fact and law the plaintiff has shown no right to relief. La. C.C.P. art. 1672(B). A motion [Bfor involuntary dismissal requires the trial court to evaluate all the evidence presented by the plaintiff and render a decision based upon a preponderance of the evidence. Chandler v. Chandler, 45,308 (La.App. 2 Cir. 5/19/10), 37 So.3d 569; Gray v. Monroe, 41,087 (La.App. 2 Cir. 5/17/06), 930 So.2d 1148. When a party fails to carry his burden of proof there is no necessity for the opposing party to rebut insufficient evidence. Humphrey v. Humphrey, 614 So.2d 837 (La.App. 2 Cir.1993). The appellate court should not reverse an involuntary dismissal in the absence of manifest error, and there is no manifest error if there is a reasonable factual basis for the finding of the trial court. Gray, supra.

Visitation

La. R.S. 9:344(A) states:
A. If one of the parties to a marriage dies, is interdicted, or incarcerated, and there is a minor child or children of the marriage, the parents of the deceased, interdicted, or incarcerated party without custody of such minor child or children may have reasonable visitation rights to the child or children of the marriage during their minority, if the court in its discretion finds that such visitation would be in the best interest of the child or children.
La. C.C. art. 136(B) states:
B. Under extraordinary circumstances, a relative, by blood or affinity, or a former stepparent or step grandparent, not granted custody of the child may be granted reasonable visitation rights if the court finds that it is in the best interest of the child. In determining the best interest of the child, the court' shall consider:
(1) The length and quality of the prior relationship between the child and the relative.
(2) Whether the child is in need of guidance, enlightenment, tutelage which can best be provided by the relative.
|fi(3) The preference of the child if he is determined to be of sufficient maturity to express a preference.
*717 (4) The willingness of the relative to encourage a close relationship between the child and his parent or parents.
(5) The mental and physical health of the child and the relative.
The burden is on the mover, the relative, to demonstrate that extraordinary circumstances exist and that the visitation is in the child’s best interests. State in Interest of D.E., 46,644 (La.App. 2 Cir. 10/12/11), 2011 WL 4839108; Lindsey v. House, 29,790 (La.App. 2 Cir. 9/24/97), 699 So.2d 1190.
The general rule established in La. C.C. art. 136 requires a relative, by either blood or affinity, to show not only extraordinary circumstances which support a granting of visitation rights, but also that visitation is in the best interest of the child. Lindsey, supra. The legislature, through La. R.S. 9:344, made it less difficult for a parent of the noncustodial parent to obtain visitation with grandchildren in two situations, i.e., when the noncustodial parent is either dead or interdicted. Id. In these two situations, the grandparent does not have to show extraordinary circumstances, but only that visitation is in the best interest of the child. Id.
Since the noncustodial parent is deceased in the present case, we conclude that the application of La. R.S. 9:344 is appropriate. Therefore, the Janways have to prove that visitation is in Z.J.’s best interest.
DISCUSSION
In the Janways’ first assignment of error, they assert that the trial court erred in granting Matthew’s motion for involuntary dismissal, which |7denied Tom visitation with Z.J. They further believe that since no evidence suggests that Tom was detrimental to Z.J.’s well-being, the trial court’s judgment should be reversed. In their second assignment of error, the Jan-ways argue that the trial court erred in granting Matthew’s motion for involuntary dismissal, which denied Rosalyn visitation with Z.J. Since the Janways discuss these two assignments of error together in their appellate brief, we will address them simultaneously in this opinion as well.
With respect to Tom, the Janways argue that the trial court failed to conduct any analysis pursuant to La. C.C. art. 134, and that “each and every factor weighs in favor of visitation.” As we determined in the previous section of this opinion, the applicable law to this case is La. R.S. 9:344. The proper analysis for this statute is whether visitation would be in the best interest of the child.
Even though Tom did not make negative comments about Matthew to other people like Rosalyn did, Tom did testify that he “saw nothing wrong” with Rosalyn’s actions. Additionally, Tom testified that he instructed Rosalyn to call Matthew’s job, so that she could report that he was dating Leanne, who was a project manager on a job for which Matthew was a project engineer. Tom admitted that at the time, “it crossed his mind that if Matt lost his job he’d have no way to support his daughter.” Based on the record, it appears that Tom was aware of Rosalyn’s behavior, and at times participated in some of her sinister actions. The evidence sufficiently supports the trial court’s decision to deny Tom’s visitation rights.
IsThe Janways believe that Rosalyn’s comments to third parties other than Z.J. do not justify denial of visitation. The Janways concede that Rosalyn may have made some negative comments about Matthew, but since they were not made in Z.J.’s presence, they could not serve as a basis for denying visitation. They argue that no evidence suggests that Rosalyn *718 undermined Z.J.’s relationship with Matthew. The record indicates otherwise.
The record contains an e-mail that Rosalyn sent, via Facebook, to Z.J.’s day school teacher, Ms. Johnette Masters:
Has Matt signed Z.J. to stay all day at school? ? He has this new girlfriend and knows we don’t approve ... It’s really nasty since we got back from cruise ... my sister and fly were to stay at his and Wendi’s house this weekend and he told Wendi I had a key to get in...., when we go there the locks were had all been changed he left the front door open and left her a new key we went in and condoms were on the bed side table house was filthy Wendi wouldn’t stay.... I called him in B.C. where he is shacking up with girlfriend at camp and dumped Z.J. at parents!!! His only answer was “you don’t have. Any business in my house” well considering I put 10,000 down on the house and bought every piece of furniture, etc ... in it! I thought on no you didn’t want me to walk in on you and wt and Z.J. in other bedroom!!! So I don’t know what else he has pulled.... I pray God will intervene for Z.J.’s well being ... she has lost her mama and doesn’t understand that ... now this other woman taking what little attention he did give her ... and if he try’s to take us out of her life ... I am the only mother figure she knows ... we have a bond she doesn’t understand!!!! Think about it he doesn’t care!!!! Thinking with the little head and not big one!!! (verbatim)
Additionally, Rosalyn left a voicemail for Cynthia Gibson, an acquaintance of Matthew and the Janways, on her cell phone after she learned that she gave a deposition in this matter. The transcript from the voicemail stated:
|3Hi, Cindy, this is Mrs. Ros. I called you earlier when we got out of our deposition and told you that I really needed to talk to you about something very important. And I know that you’re not going to take my call, so either you call me back or you can just be subpoenaed, whichever one you want to do. But my lawyer wants to talk to you. And Matt hung you out to dry. You and you alone are the reason why he took Z.J. away from us is what he told us today. His defense was, “The reasons that I took Z.J. away from the Janways is because of an e-mail I got from Cindy Gobson that said Mrs. Janway had been talking about me.” And anything I’ve told you about him, I’ll gladly say to his face. So there’s no problem with that, but the problem is, is that you sold Wendi out. And I wish now I would have never had you to come and get one thing of hers. Because she is looking down right now and in disgust that you would do her baby daughter that way. And I have never been so disappointed in any one person in my life as I am you. And you need to call me back and we need to discuss this. If not, we can discuss it when you go to court, but you will be subpoenaed. My lawyer said to give you a chance to call and talk to me. If you don’t want to do that, then just plan on being subpoenaed. You heard what I told her? (verbatim)
The above instances are only a couple of examples exhibiting Rosalyn’s irrational behavior. Unfortunately, the record is riddled with many more examples.
Dr. E.H. Baker, a medical psychologist, testified that depriving the Janways of visitation would harm Z.J., since they were very involved in her life and her mother died at a very young age. He conceded that he made his findings without having any contact with anyone other than the Janways. His findings are arguably “one- *719 sided.” However, he made a statement, explaining how Rosalyn’s negative comments would impact Z.J.
Q. Okay. With respect to Z.J., if in fact Ms. Janway is making negative comments to that child about her father, who she loves, how will that affect Z.J. from here on out?
A. Okay. That would be — that would have a negative impact because Z.J. loves her father. You know, I haven’t met Z.J. I’m sure that that (sic) is the case because children do love their 1 infathers in most instances, so I’m sure that Z.J. loves her father. If her grandmother, whom I would guess that she also loves, is making negative comments, there’s going to be a great deal of confusion to that child, and so it’s certainly not — not good for Z.J. It’s not in her best interest to be — have anyone talking negatively about her father.
We note that Dr. Baker stated that Rosalyn possessed “overbearing” characteristics. When the trial court asked Dr. Baker his professional opinion regarding the Janways’ visitation with Z.J., he commented that the Janways needed “a least a couple of sessions with someone,” before they could attempt a visitation with Z.J. We agree. The evidence supports the trial court’s decision to deny Rosalyn’s visitation rights.
The record contains no evidence that Matthew is an unfit father. It is clear that Z.J. is thriving in her environment. She attends day school, participates in many extracurricular activities, i.e. gymnastics, and goes to play date.
The record supports the assertion that the Janways have actively participated in Z.J.’s life from birth, until her current age of four. We do not doubt that the Jan-ways love their granddaughter, and that she loves them as well. However, the record indicates that the quality of their relationship is questionable.
The evidence strongly suggests that the Janways are attempting to interfere and sabotage the relationship that Matthew had with his daughter. Matthew’s actions reflect a father who is attempting to protect Z.J., by removing persons from Z.J.’s life who are not acting in her best interests.
|T1We find that granting the Janways visitation at this time would not be in the best interest of the child, Z.J.[1] These two assignments of error are without merit.
CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is affirmed. All costs associated with this appeal are assessed against the plaintiffs/appellants, the Janways.
AFFIRMED.

. The trial court recited a "hypothetical” in open court suggesting that the Janways participate in counseling, establish a history of better behavior, and "come back through a proper procedure.”